**STATE OF IDAHO, Petitioner,**

**Shoshone–Bannock Tribes, Intervenors,**

**v.**

**U.S. DEPARTMENT OF ENERGY, Respondent,**

**Public Service Company of Colorado, Intervenor.**

**No. 91–70094.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 1991.

Decided Sept. 20, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 13, 1991.

---

Before WRIGHT, FARRIS and TROTT, Circuit Judges.

Clive J. Strong, Deputy Atty. Gen., Natural Resources Division, Boise, Idaho, for petitioner.

David C. Shilton, Appellate Section, Environmental and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Jeanette Wolfley, Tribal Attys. Office, Fort Hall, Idaho, for intervenor-petitioner.

David W. Kerber, Kelly, Stansfield and O'Donnell, Denver, Colo., for intervenor-respondent.

FARRIS, Circuit Judge:

The State of Idaho petitions for review of the Department of Energy's decision to transport into Idaho for storage spent nuclear fuel produced at the Fort St. Vrain nuclear power station in Colorado. Shoshone–Bannock Indian Tribes intervene on behalf of Idaho and argue that transportation of the radioactive material violates various governmental obligations to the Indians. Public Service Company, the owner of the Fort St. Vrain plant, intervenes on behalf of DOE. We dismiss the petition for lack of jurisdiction.

I. Background

In 1965, the Atomic Energy Commission entered into a contract with the Public Service Company of Colorado to construct an experimental nuclear generator. Unlike conventional reactors which use low uranium fuel and a water process for cooling, the contracted High Temperature Gas–Cooled Reactor required a special enriched uranium fuel and used "dry" helium gas cooling, a technology believed to be more safe and clean. In allocating the responsibilities for the project, the government agreed to "[p]urchase ... fuel elements discharged" from the reactor and "[r]eprocess" the elements if funds were appropriated for a reprocessing facility.

Pursuant to the contract, Public Service constructed the Fort St. Vrain Nuclear Power Plant. The Fort St. Vrain reactor was the first United States power reactor to store spent fuel dry instead of under water. The reactor was accepted for commercial operation as of January 1, 1979. In 1975, the government, in anticipation of its responsibility for the spent fuel, constructed the Irradiated Fuels Storage Facility at Idaho National Engineering Laboratory. An uncontested Environmental Impact Statement was completed in 1977 concerning waste management operations at the Idaho National Engineering Laboratory, including storage in the Irradiated Fuels Storage Facility.

In order to implement the terms of the 1965 contract, DOE (which had replaced the Atomic Energy Commission) entered into an agreement with Public Service on April 1, 1980, modifying the contract to specify the conditions for transfer of the spent fuel. Under the 1980 modification, the government agreed, pursuant to its obligations under the original contract, to purchase eight "nuclear fuel segments discharged from the Plant" for $5.4 million, upon delivery to the Idaho facility. Public Service delivered the first segment of spent fuel to the Idaho facility in 1980. Two additional segments were shipped in 1982 and from 1984–1986, without incident.

Because the Fort St. Vrain plant was operating at a restricted rate, it became

clear that all eight of the contracted fuel segments would not be delivered prior to January 1, 1987—the term set by the original contract. In a 1983 memorandum, the Chief Counsel to DOE indicated that he believed the 1980 modification evinced "a commitment by the parties to specify the amount of fuel as eight segments rather than to base the amount of fuel to be delivered upon a particular time." Consequently, he interpreted the contract, as modified by the 1980 agreement, to obligate DOE to receive eight segments of Fort St. Vrain spent fuel regardless of the time of delivery. In November of 1987, Public Service sent a letter to DOE stating that they understood the contract, as modified, to require DOE to accept eight segments of fuel regardless of the date of delivery and indicating that they would demand an extension if DOE considered the contract expired as of January 1, 1987. On May 11, 1988, DOE and Public Service agreed to an additional modification to the contract stating that the "contract shall continue in effect until the company has delivered eight fuel segments which is currently estimated to be by December 31, 1997."

In August of 1989, Public Service decided to shut down the Fort St. Vrain reactor because the plant was no longer commercially operable. Public Service notified DOE that it planned to deliver the remaining five fuel segments under the contract and a sixth segment if DOE was willing. Governor Andrus of Idaho, apprised of the proposed delivery, communicated in a letter to the manager of the DOE Idaho Operations Office that Idaho was no longer willing to receive radioactive waste from another state.

DOE prepared an environmental assessment pursuant to the National Environmental Policy Act to determine the impact of transporting and storing this radioactive material. The environmental assessment concluded that there would be no significant environmental impact, and, on February 5, 1991, the DOE issued a formal Finding of No Significant Impact. On February 6, Governor Andrus sent a letter to Public Service stating that the Fort St. Vrain spent fuel would "not be permitted in the State of Idaho," and that the State was "prepared to take all appropriate steps to prevent these shipments from entering the State of Idaho." DOE notified Governor Andrus on February 7, 1991, that it intended to receive the spent fuel. The next day Idaho filed this petition.

## II. Discussion

Idaho does not allege that it has authority to preclude the transfer of spent fuel from Colorado to the federal facility in Idaho. Rather, it argues that the transportation and storage of the nuclear material violates various requirements of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101–10270, and the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370b.

The procedural posture of this action differs from typical petitions for review of administrative action. This petition was not preceded by any formal administrative or judicial proceeding. There is no formal agency order, opinion, or findings of fact or law for review.

Idaho asserts original jurisdiction in this court pursuant to the Nuclear Waste Policy Act, 42 U.S.C. § 10139. All claims other than those brought pursuant to the Nuclear Waste Policy Act are based on pendent jurisdiction. Shoshone–Bannock Indian Tribes also assert original and pendent jurisdiction pursuant to the Nuclear Waste Policy Act.

DOE does not contend that the decision to store the Fort St. Vrain material comported with various requirements of the Nuclear Waste Policy Act. Rather, DOE argues that: (1) the Act is inapplicable to storage agreements reached prior to the statute's enactment and (2) the current storage decision fulfills the government's pre-existing obligation under the original 1965 contract as clarified by the subsequent modification agreements. Idaho argues that: (1) the Nuclear Waste Policy Act is comprehensive legislation governing all federal storage of civilian nuclear waste; (2) DOE had no authority to enter agreements for storage of nuclear waste

prior to enactment of the Act; and (3) the 1988 modification extending the term for delivery of the radioactive waste was an agreement for interim storage subject to the Act.

In determining the applicability of the Nuclear Waste Policy Act to pre-existing storage agreements, we first look to the plain language of the statute. Subchapter I, Part B, of the Act governs interim storage. Section 10155 states:

(a)(1) [DOE] shall provide, in accordance with paragraph (5), not more than 1,900 metric tons of capacity for the storage of spent nuclear fuel from civilian power reactors....

.     .     .     .     .

(5) [DOE] shall ensure that storage capacity is made available under paragraph (1) when needed, as determined on the basis of the storage needs specified in contracts entered into under section 10156(a) of this title, and shall accept upon request any spent nuclear fuel as covered under such contracts....

.     .     .     .     .

(b)(1) Subject to the capacity limitation established in subsections (a)(1) and (d) of this section, [DOE] shall offer to enter into, and may enter into, contracts under section 10156(a) of this title with any person generating or owning spent nuclear fuel for purposes of providing storage capacity for such spent fuel under this section only if the Commission determines that—

(A) adequate storage capacity to ensure the continued orderly operation of the civilian nuclear power reactor at which such spent nuclear fuel is generated cannot reasonably be provided by the person owning and operating such reactor at such site....

Section 10156(a) provides:

During the period following January 7, 1983, but not later than January 1, 1990, [DOE] is authorized to enter into contracts with persons who generate or own spent nuclear fuel resulting from civilian nuclear storage activities for the storage of such spent nuclear fuel in a [federal]

storage capacity provided under this part: *Provided, however,* That [DOE] shall not enter into contracts for spent nuclear amounts in excess of the available storage capacity specified in section 10155(a) of this title.

■ The statute does not expressly address the Act's applicability to pre-existing storage agreements. Read in light of the statute's historical context and the accompanying legislative history, however, the language and structure of the Act indicate that it does not apply to storage agreements in existence before its enactment.

Prior to the late 1970's, private utilities operating nuclear reactors were largely unconcerned with the storage of spent nuclear fuel. It was accepted that spent fuel would be reprocessed. Utilities entered contractual agreements for their spent fuel with private reprocessors. H.R.Rep. No. 491, 97th Cong., 2nd Sess., pt. 1, p. 27, U.S.Code Cong. & Admin.News 1982, pp. 3792, 3793. In the mid–70's, however, the private reprocessing industry collapsed for both economic and regulatory reasons. *Id.* As a consequence, the nuclear industry was confronted with an unanticipated accumulation of spent nuclear fuel, inadequate private facilities for the storage of the spent fuel, and no long term plans for managing the nuclear waste. *Id.*

Because of the dangers of this unanticipated nuclear waste accumulation, Congress enacted the Nuclear Waste Policy Act. The Act was directed toward both the immediate and long term problems associated with storage of nuclear waste. Congress settled on a long-term policy of permanent storage. *Id.* at p. 29. Because the construction of permanent nuclear waste repositories would take years and the nuclear waste bottleneck caused by the collapse of the reprocessing industry threatened the continued operation of many reactors, Congress authorized DOE to contract with private utilities for interim storage at existing federal facilities. *Id.* at p. 37.

■ Understood in terms of its history, the interim storage provisions of the Nuclear Waste Policy Act are not comprehensive regulations governing all federal

storage of nuclear waste, but remedial legislation addressed to a specific problem. Congress recognized that federal facilities could provide interim storage for a limited quantity of the spent fuel left unaccounted for by the collapse of the reprocessing industry. The Act specifies that DOE, during the period from January 7, 1983, to January 1, 1990, provide for the storage of up to 1900 tons of private spent fuel not otherwise accounted for, and for which storage was necessary to ensure a reactor's continued operations. To ensure that this storage was undertaken in a safe and orderly fashion, the Act imposes a number of requirements. These requirements do not, however, apply to all federal storage of spent nuclear fuel. Each of the Act's various requirements concerning interim storage are specifically limited to contracts entered into pursuant to section 10155(a)(1)(A). Congress was aware that the government had other obligations for the storage of spent nuclear fuel. H.R.Rep. No. 491, 97th Cong., 2nd Sess., pt. 1, p. 37. The government's pre-existing storage of spent nuclear fuel was the reason federal facilities were available to remedy the nuclear waste problem. The Act's restrictive language limits the requirements to the specific set of remedial storage agreements authorized by the Act itself. Spent nuclear fuel accounted for by pre-existing agreement was not part of the pool of radioactive material for which there was no available storage and for which interim storage was necessary to ensure continued operations. Such pre-existing agreements were not entered into under the auspices of section 10155 of the Nuclear Waste Policy Act, nor was this accounted for spent fuel the subject of the Act. *Id.* at pp. 37–38. The Nuclear Waste Policy Act does not apply to federal interim storage agreements in existence before its enactment.

■ Idaho argues that the Nuclear Waste Policy Act must apply to the interim storage of Fort St. Vrain spent nuclear fuel because DOE had no authority to provide interim storage independent of the Act. The original statute authorizing the Fort St. Vrain project provided that the government was "authorized ... to purchase ... the isotope 233 produced in and discharged from the reactor." Public Law 89–32, p. 122 (June 2, 1965). Public Law 89–32 vested DOE with authority to provide storage for Fort St. Vrain spent nuclear fuel independent of the Nuclear Waste Policy Act.

■ Idaho also argues that DOE was authorized only to purchase the Fort St. Vrain spent nuclear fuel for reprocessing. Although it was originally contemplated that the spent fuel would be reprocessed, neither Public Law 89–32 nor the contract limited DOE's purchasing authority to reprocessing. DOE's obligation to purchase the Fort St. Vrain spent fuel is not contingent on the reprocessing of the nuclear material.

■ Idaho argues that, even if the Nuclear Waste Policy Act does not apply to pre-existing storage agreements and DOE had independent authority to provide for the storage of Fort St. Vrain spent fuel, the 1988 modification was an agreement to store spent fuel subject to the Act. The original contract, as modified in 1980, required DOE to accept eight spent fuel segments. The original contract provided for an extension of the contract period based on "other specific provisions." The 1980 modification was a specific provision extending the contractual agreement until the delivery of eight spent fuel segments. The contracting parties do not dispute that DOE was under a pre-existing obligation to receive the spent fuel. The record does not contain evidence contrary to the parties expressed understanding. On this record, we must conclude that the 1988 modification merely clarified the parties' pre-existing obligations and did not constitute a separate contractual agreement.

Finally, Idaho argues that Public Service plans to deliver a ninth spent fuel segment to DOE. According to Idaho, DOE's contract defense cannot apply to this segment because the 1965 agreement and subse-

quent modifications provided for DOE to receive only eight spent fuel segments. Before Public Service delivers the ninth segment, however, Idaho's claims that the storage of Fort St. Vrain nuclear fuel poses environmental hazards presumably will be addressed by the district court. Because the district court is a more appropriate forum for the resolution of such fact-laden controversies, we hold that the final segment is an insufficient basis upon which to grant original and pendent jurisdiction in this court. *See Sandell v. Federal Aviation Admin.*, 923 F.2d 661, 664 (9th Cir. 1990) (ripeness doctrine is made up of policy considerations as well as Article III case or controversy requirement) (citing 13A Charles A. Wright et al., *Federal Practice and Procedure: Jurisdiction* 3532 (2d ed. 1984)). We make no determination regarding potential statutory limitations to such an action.

DISMISSED. This court's injunction, issued on May 14, 1991, is vacated. The mandate will issue now.