959 F.2d 149
 34 ERC 1812, 22 Envtl. L. Rep. 20,819
 IDAHO DEPARTMENT OF HEALTH AND WELFARE, Plaintiff-Appellee,
and
Public Service Company of Colorado,
Plaintiff-Intervenor-Appellant,
Applicant-in-Intervention-Appellant,
v.
UNITED STATES DEPARTMENT OF ENERGY, an agency of the United
States, James D. Watkins, Secretary, United States
Department of Energy, Augustin Pitrolo, Manager, Idaho
Operations Office, United States Department of Energy,
Defendants-Appellees.
 No. 91-36252.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 6, 1992.
Decided March 23, 1992.
 
 David C. Shilton, Environment and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants-appellants.
 John C. McCreedy, Deputy Atty. Gen., Boise, Idaho, for plaintiff-appellee.
 David W. Kerber, Kelly, Stansfield & O'Donnell, Denver, Colo., for applicant-in-intervention-plaintiff-intervenor-appellant.
 Appeal from the United States District Court for the District of Idaho.
 Before: WRIGHT, Circuit Judge, ALARCON, Circuit Judge, and DAVIES,* District Judge.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 This is the third round in Idaho's long-running fight to stop Colorado from storing its nuclear waste in Idaho. Idaho first threatened to use force to stop the shipments, and then claimed the shipments violated the Nuclear Waste Policy Act. A federal court enjoined the threatened use of force, and this court rejected the Nuclear Waste Policy Act claim. Idaho v. U.S. Dept. of Energy, 945 F.2d 295 (9th Cir.1991). Less than two weeks later, Idaho returned to court, arguing this time that the shipments violated Idaho's clean air regulations. It persuaded the district court to issue a preliminary injunction, but we vacate that injunction today because we find that under any reasonable interpretation of the regulations, Idaho's claim must fail.
 
 
 2
 * In the mid-1960s, the predecessor to the Department of Energy (DOE) contracted with Public Service Company to build and operate the Fort St. Vrain nuclear power plant. The contract provided that the government would purchase spent fuel from the plant.
 
 
 3
 The plant did not begin operation until 1979. Four years earlier, in anticipation of its obligation to accept the spent fuel, the federal government constructed a storage facility in Idaho. The facility was designed and built specifically to store the Fort St. Vrain fuel, and was completed with Idaho's knowledge and approval.
 
 
 4
 In 1980, DOE and Public Service agreed to modify the contract, setting forth the details for transferring spent fuel to DOE. The Department agreed to purchase eight fuel segments upon delivery to the Idaho storage facility, and, at DOE's option, it could accept a ninth segment.
 
 
 5
 Three segments were delivered from 1980 to 1986. In August 1989, Public Service decided to close the Fort St. Vrain plant and ship the remaining spent fuel segments to Idaho. Idaho objected, however, and this suit is Idaho's latest attempt to keep the spent fuel from entering the state.
 
 
 6
 After the facility was built, Idaho enacted comprehensive air pollution control regulations as part of its approved implementation plan under the Clean Air Act. See Idaho Code § 39-101 et seq. These regulations require a permit before construction of any new source of air pollution. Existing sources such as this storage facility are specifically excluded from the regulations. Yet Idaho can require permits at these grandfathered sites if there is additional construction or a modification.
 
 
 7
 Idaho says that is exactly what is occurring here. In its view, each time DOE places a new block of fuel in the storage facility, it is engaging in new construction and a modification. The district court agreed. It found that under Idaho law DOE was required to obtain a "permit to construct" before receiving additional shipments, and until it did, DOE was enjoined from accepting more fuel.
 
 II
 
 8
 Idaho presses alternative grounds supporting its contention that the shipments require a "permit to construct". It says that each additional block of spent fuel constitutes a "stationary source" of air pollution, as defined by the regulations. Both parties agree that the regulations require a permit for the installation of a new "stationary source".
 
 
 9
 Even if each additional block of fuel is not a "stationary source", DOE concedes that the storage facility is. According to Idaho, the storage of additional waste at the facility constitutes a "modification" under the regulations. Modifications, like installations, require permits.
 
 
 10
 a. Installation of a new "stationary source".
 
 
 11
 The resolution of this issue lies in the regulations' definition of a "stationary source". If the "stationary source" is the storage facility rather than each block of fuel, then DOE is not installing a "stationary source" each time it adds fuel to the facility.
 
 
 12
 The regulations define a "stationary source" as "[a]ny building, structure, emissions unit, or installation which emits or may emit any air contaminant." IDAPA § 16.01.1002.20. The spent fuel is obviously not a building, nor does it qualify as a structure or installation.
 
 
 13
 Yet the regulations define "emission units" broadly enough to encompass just about any contaminant-producing item. These include any "identifiable piece of process equipment or other part of a facility which emits or may emit any air contaminant." IDAPA § 16.01.1002.32. The key then is not the physical characteristics of the item in question, but whether it emits or may emit air contaminants.
 
 
 14
 At first glance, this definition appears to include the spent fuel blocks. DOE itself concedes that the blocks potentially release radionuclides, a recognized air contaminant. Yet the regulations define "emissions" precisely, and under this definition when the blocks are placed in the storage facility they can not be considered "emissions units".
 
 
 15
 According to the regulations, an "emission" is "[t]he act of releasing or discharging air contaminants into the ambient air." IDAPA § 16.01.1002.29. "Ambient air" is further defined as "[t]hat portion of the atmosphere, external to buildings, to which the general public has access." IDAPA § 16.01.1002.10.
 
 
 16
 In light of this definition, we have little doubt that if, for example, DOE were simply storing the spent fuel in open fields, it would be required to obtain a permit for each block of fuel. But here it is storing the blocks in a facility designed to contain the air contaminants. If the fuel releases any contaminants, it does so only into the interior air of the building.
 
 
 17
 In enjoining the shipments, the district court overlooked the significance of the regulations' definition of an "emission". In considering whether the new fuel constituted a "stationary source", the court failed to consider whether the contaminants would be released to the "ambient air" or whether the releases would occur within the building, failing to qualify as "emissions". The court's oversight led it to conclude incorrectly that the spent fuel qualified as "emission units", and therefore "stationary sources".
 
 
 18
 Idaho points out that the storage facility's filters do not prevent all of the air contaminants from escaping to the "ambient air". Although the filters are highly efficient, and evidence produced at the hearing suggests there is no correlation between the addition of fuel and the level of releases, DOE concedes that a small amount of the contaminants avoid the filtering process. Idaho argues that because of this, each block of spent fuel must be considered an "emissions unit" because contaminants from it may eventually be released to the "ambient air".
 
 
 19
 Idaho seeks to take advantage of the technical meaning of an "emissions unit" to require permits for each fuel block, but in doing so it ignores its own regulations. The regulations define "emission" precisely: it is "[t]he act of releasing or discharging air contaminants into the ambient air". IDAPA § 16.01.1002.29 (emphasis added). Under this definition, the stored fuel can never emit contaminants. The act of releasing or discharging occurs only when the building's filtering system fails to contain the contaminant, and instead releases it, through a vent to the "ambient air".
 
 
 20
 This definition is consistent with the underlying purpose evident in Idaho's pollution control laws. Idaho seeks to maintain the quality of its air for the benefit of its citizens. See Idaho Code §§ 39-102, 105(3)(j). If DOE's storage facility never allowed releases to the "ambient air", Idaho would have no interest in regulating it. Its interest in the air quality in the facility is limited to the extent that degradation of the interior air eventually affects the quality of the "ambient air". DOE seeks no more than to operate the facility within its design capacity and as it has been approved by Idaho through the regulations' grandfathering provision.
 
 
 21
 We conclude that each block of additional fuel does not constitute an "emissions unit" and, as a result, installation of these blocks does not constitute new construction. We are unpersuaded by Idaho's argument that such an interpretation will result in "regulatory chaos". Contrary to its assertions otherwise, it remains free to regulate any contaminant-producing source, whether it is a block of fuel or a storage facility, as long as that source emits to the "ambient air". Idaho can not take advantage of its regulations, however, to regulate a grandfathered facility operating within its design limitations.
 
 
 22
 b. Modification of an existing source.
 
 
 23
 Even if the storage facility rather than the fuel is considered the "stationary source", DOE must first obtain a permit before it undertakes a "modification" of the facility. The regulations define a "modification" as:
 
 
 24
 Any physical change in, or change in the method of operation of, a stationary source or facility which increases the amount of any air contaminant.... [T]he following shall not be considered a change in method of operation: a. An increase in the production rate if such increase does not exceed the operating design capacity of the affected stationary source, and if a more restrictive production rate is not specified in a permit....
 
 
 25
 IDAPA § 16.01.1002.58. In short, the regulations ask (1) whether the facility has been changed, and (2) did the change increase emissions? Relying on this definition, Idaho argues that the storage of additional fuel is a "modification".
 
 
 26
 We find little merit in Idaho's interpretation of what constitutes a "modification". Where, as here, there is a long-established facility specifically designed and built to store the spent fuel, it strains reason to find that simply moving fuel into the facility constitutes a "modification" of the facility itself. DOE is not physically changing the facility, nor is it altering the method of operation. As the regulations themselves make clear, as long as the storage of the fuel does not exceed the operating design capacity of the facility, it is not a "modification". IDAPA § 16.01.1002.58a.
 
 
 27
 c. Deference to Idaho's interpretation of its regulations.
 
 
 28
 We recognize that by ruling as we do today, we contradict Idaho's interpretation of its own regulations. This court ordinarily grants substantial deference to such interpretations. Lyng v. Payne, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). If an agency's interpretation is a reasoned and consistent view of its regulations, we will not substitute our own interpretation for that of the agency's. Id. Because we find that Idaho's proffered interpretations are neither, we grant no deference here.
 
 
 29
 We can find no means of reconciling Idaho's suggested interpretation and the plain language of the regulations. Nor can we discern any past rulings or administrative practice to support Idaho's view. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988).
 
 
 30
 Idaho points to several past permitting processes as evidence of its consistent view on this subject. It relies on the permitting work it did for the Transuranic Retrieval and Storage Area, the Potlach lime slaker unit and an evaporation pond. In each case, it required a permit to construct before the proposed facility could begin operation. What Idaho overlooks, however, is that in each of these instances, the proposed activity potentially emitted contaminants to the ambient air. In none of these cases did Idaho take the extreme position it has taken here.
 
 
 31
 Even more telling is Idaho's long standing practice of allowing spent fuel to be shipped to this storage facility. Shipments started in 1980 and, by our estimate, DOE accepted more than 120 shipments before Idaho complained in 1989. Even then Idaho did not rely on its clean air regulations when it objected. It first threatened to use force to stop the shipments at the border. When it was enjoined from carrying out its threats, it returned to court alleging violations of the Nuclear Waste Policy Act. When that failed, it promised to find other legal roadblocks to stop the shipments. Only then did it decide that the storage of additional fuel violated its clean air laws. We grant no deference to an interpretation put forth merely as a litigation position. See, e.g., Georgetown Univ. Hosp. v. Sullivan, 934 F.2d 1280, 1283 n. 3 (D.C.Cir.1991).
 
 III
 
 32
 Public Service sought intervention to protect its interests in having the spent fuel stored in Idaho. In explaining why DOE could not represent its interests, it noted that DOE unlike Public Service had no interest in ensuring that Idaho post a bond when it obtained the preliminary injunction. Because we vacate the injunction, Public Service's application for intervention is moot.
 
 
 33
 The preliminary injunction is VACATED. This cause is remanded to the district court with instructions to enter judgment for the Department of Energy. Public Service Company's application for intervention is DISMISSED as moot. The mandate will issue now.
 
 
 
 *
 Honorable John G. Davies, United States District Court for the Central District of California, sitting by designation