874 So.2d 1075 (2003)
The KIDS' KLUB, INC.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
2010453.
Court of Civil Appeals of Alabama.
June 20, 2003.
Rehearing Denied September 12, 2003.
*1079 H. Carey Walker III of Adams & Walker, P.C., Huntsville, for appellant.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and *1080 Sharon E. Ficquette, asst. atty. gen., Department of Human Resources.
PER CURIAM.
The Kids' Klub, Inc. (hereinafter "KK"), operates a child-care facility in Decatur. Before April 1998, KK had a daytime-care license and a nighttime-care license. Following a March 26, 1998, incident in which a child was left unattended in the KK facility after it had closed for the evening, the State Department of Human Resources ("DHR") suspended KK's nighttime-care license. DHR also notified KK that it was seeking to permanently revoke KK's nighttime-care license. DHR prevailed in KK's administrative appeals and in its appeal to the circuit court. KK then appealed to this court.
The record indicates that KK usually operated its nighttime-care facility until 12:30 a.m. Sheila Hines enrolled her daughter, Martena Lashe Haley ("the child"), in the KK nighttime-care program in September 1997. The child was in the care of KK on the evening of March 26, 1998; at that time, the child was 23 months old.
The record indicates that after approximately 8:30 p.m. on the evening of March 26, 1998,[1] Tiffany Billings and Barbara Bolden were the only KK employees remaining in the facility. Billings testified that she had approximately 18 children in her care at that time; it is not clear how many children Bolden, who was working in the infant or toddler room on the night of March 26, 1998, had in her care. Bolden testified that when all of the infants in her care, except for the child, had been picked up from the KK facility by their parents, she decided to go home for the night. Bolden testified that before she left the KK facility, she informed Billings, who was working in another room, that the child was asleep in a crib in the nursery. Bolden's time card indicates that she clocked out for the night at approximately 10:04 p.m. on March 26, 1998.
Billings testified that she did not recall Bolden's informing her that the child was still in the nursery. When Bolden left the KK facility, Billings had four children in her classroom in the KK facility. Billings testified that approximately an hour after Bolden left, the parents of those four children picked up their children. Billings stated that she looked around the facility, saw no children, locked the facility, and left for the night. Billings's time card indicates that she clocked out at approximately 11:36 p.m. on the night of March 26, 1998. It is undisputed that when Billings left the KK facility, the child was still alone in the nursery.
Hines testified that she left her place of employment at approximately 11:25 p.m. on the evening of March 26, 1998, and that she drove to the KK facility to pick up the child. Hines estimated that it took her approximately 15 minutes to drive from her place of employment to the KK facility. When Hines arrived at the KK facility, she found the facility dark and locked. Hines testified that she knocked on the door to the facility and that nobody answered. Hines then left to go to a friend's house to telephone the KK facility; she also verified that no friend or family member had picked the child up from the KK facility. Hines stated that when she realized that no friend or family member had retrieved the child and when her telephone *1081 call to the KK facility went unanswered, she returned again to the facility to knock on the door. When again no one answered Hines's knock, she telephoned the police. Hines stated that the police advised her to return home and wait there for them to arrive.
Marlene Perry, the director or manager of KK, testified that the police telephoned her at approximately 11:50 p.m. on the night of March 26, 1998, to inquire whether a child had been left at the KK facility. Perry testified that she arrived at the KK facility at approximately 12:20 a.m. and that she found the child asleep in a crib in the KK nursery. Perry immediately called Bolden and Billings and told them to return to the KK facility.
Mike Landrum, the police officer who investigated the March 26, 1998, incident, testified that he arrived at the KK facility at 12:54 a.m. Landrum testified that when he arrived, he saw Perry at the facility. Landrum also stated that when he investigated to ensure that the child was safe, he saw two other workers, presumably Bolden and Billings, inside the KK facility. Landrum testified that Hines arrived at the KK facility approximately 15 to 30 minutes after he arrived.[2]
KK and a DHR social worker each reported the March 26, 1998, incident to DHR; Beverly McDaniel investigated the incident on behalf of DHR. McDaniel is a child-development consultant whose responsibility it is to oversee the licensing of child-care centers; to consult with licensees regarding their compliance with DHR regulations, found at Rule 660-5-25-.05, Ala. Admin. Code, entitled the "Day Care Licensure-Minimum Standards for Day Care Centers and Nighttime Centers" (hereinafter referred to as "the Minimum Standards"),[3] for the operation of child-care facilities;[4] and to investigate complaints regarding noncompliance with the Minimum Standards. McDaniel testified that because she could not travel to the KK facility until March 30, 1998, she spoke by telephone to Perry concerning certain changes KK could implement in the interim to ensure the safety of the children in its care and to prevent a recurrence of the March 26, 1998, incident.
During the course of her investigation of the March 26, 1998, incident, McDaniel discovered, among other things, that Bolden was only 18 years old; the Minimum Standards require that all child-care workers with the responsibility of caring for children must be 19 years old and have a high-school diploma or a GED certificate. See Rule 660-5-25-.05(5)(a)3., Ala. Admin. Code (governing staff qualifications). Perry, who had hired Bolden to work at KK, explained that she had taken note only of the year, and not of the month, in which Bolden was born, and, therefore, that she had mistakenly assumed that Bolden was 19 years old.
Following McDaniel's investigation, DHR notified KK by certified letter dated April 2, 1998 ("the charge letter" or "the April 2, 1998, charge letter"), that it was immediately suspending and moving to revoke KK's nighttime-care license. The *1082 charge letter set forth 14 grounds upon which DHR had relied in reaching its decision to move to revoke KK's nighttime-care license.
KK requested a hearing following its receipt of the charge letter. DHR appointed a hearing officer, and the hearing officer received documentary evidence and testimony over a two-day hearing conducted on July 2, 1998, and July 22, 1998. On July 30, 1998, the hearing officer specifically found that DHR had proven 6 of the 14 grounds for revocation, and the hearing officer entered an order revoking KK's nighttime-care license.
On August 13, 1998, KK requested a fair hearing pursuant to § 38-7-9, Ala.Code 1975. The fair-hearing officer ("the FHO") conducted a record review of the prior proceedings, and, on October 5, 1999, the FHO affirmed the hearing officer's decision to revoke KK's nighttime-care license. KK appealed to the Morgan Circuit Court, which affirmed the administrative orders revoking KK's nighttime-care license. KK then appealed to this court.
On appeal, KK argues a number of issues that can be distilled into the following seven contentions: (1) that DHR had stated no legal grounds to order a summary, or emergency, suspension of KK's nighttime-care license as of April 2, 1998; (2) that the charge letter did not comply with the notice requirements of § 41-22-12(b), Ala.Code 1975; (3) that the hearing officer failed to confine the evidence presented during the administrative hearing to the allegations listed in the charge letter; (4) that the hearing officer admitted hearsay evidence without making findings purportedly required by § 41-22-13(1), Ala.Code 1975; (5) that DHR regulations authorizing the revocation of KK's license are beyond the scope of DHR's enabling legislation, are ultra vires, and are, therefore, void; (6) that the decision to revoke KK's license was not supported by substantial evidence or legal authority; and (7) that the circuit court erred by prohibiting KK from engaging in discovery directed to an alleged ex parte contact between the FHO and a supervisor at DHR.

Standard of Review
This court reviews the circuit court's judgment applying no presumption of correctness, "since that court was in no better position to review the order of the [hearing officer] than we are." State Health Planning & Res. Dev. Admin. v. Rivendell of Alabama, Inc., 469 So.2d 613, 614 (Ala.Civ.App.1985). However, this court and the circuit court must apply a presumption of correctness to the agency's decision, "especially where the subject matter is peculiar to the field of competence that has been entrusted to the agency by the Alabama Legislature." State Dep't of Human Res. v. Gibert, 681 So.2d 560, 562 (Ala.Civ.App.1995). Thus, as stated in the Child Care Act of 1971, § 38-7-1 et seq., Ala.Code 1975, this court and the circuit court must determine whether the agency's decision "was illegal, capricious, or unsupported by the evidence." § 38-7-9, Ala.Code 1975. See also Kid's Stuff Learning Ctr., Inc. v. State Dep't of Human Res., 660 So.2d 613 (Ala.Civ.App. 1995). The reviewing courts may not substitute their judgment for that of the agency. Colonial Mgmt. Group, L.P. v. State Health Planning & Dev. Agency, 853 So.2d 972 (Ala.Civ.App.2002); State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d 176 (Ala.Civ.App. 1999); State Dep't of Human Res. v. Gibert, supra. "`This holds true even in cases where the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result.' " Colonial Mgmt. Group, L.P. v. State Health Planning & Dev. Agency, 853 So.2d at 975 (quoting Health Care Auth. of *1083 Huntsville v. State Health Planning Agency, 549 So.2d 973, 975 (Ala.Civ.App.1989)). Also, an agency's interpretation of its own rules and regulations controls if that interpretation is reasonable, even if another, perhaps more reasonable, interpretation is advanced. State Dep't of Human Res. v. Gibert, supra; State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., supra.
Further, because this case falls within the purview of the Alabama Administrative Procedure Act, § 41-22-1 et seq., Ala. Code 1975 ("the AAPA"), we must also keep in mind the standard of review provided by the AAPA.
Pursuant to § 41-22-20(k), Ala.Code 1975, we note that:
"(k) Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute.... The court may reverse or modify the decision or grant other appropriate relief ... if substantial rights of the petitioner have been prejudiced because the agency action is any one or more of the following:
"(1) In violation of constitutional or statutory provisions;
"(2) In excess of the statutory authority of the agency;
"(3) In violation of any pertinent agency rule;
"(4) Made upon unlawful procedure;
"(5) Affected by other error of law;
"(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
"(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion."

I. Grounds for the Summary Suspension of KK's Nighttime-Care License
Before the hearing officer, KK attempted to demonstrate that after McDaniel's March 30, 1998, inspection of its facility, it implemented the changes and safety measures McDaniel recommended. Therefore, it maintained in the circuit court that it had remedied any "dangerous" situation and, therefore, it argued, there was no basis for DHR's emergency suspension of its nighttime-care license. KK does not make that argument before this court; therefore, we do not address it.
On appeal, KK asserts that DHR was without authority to summarily suspend its nighttime-care license because, it contends, DHR cited improper legal authority for that suspension.[5] At the beginning of the April 2, 1998, charge letter, DHR notified KK that it was immediately suspending KK's license pursuant to § 41-22-19(d), Ala.Code 1975, and that it was also seeking to revoke KK's license. In the next paragraph in the charge letter, DHR cites as the statutory authority for the suspension and revocation of KK's nighttime-care license § 38-7-8, § 38-7-9, and § 41-22-19, Ala.Code 1975.
KK argues on appeal that DHR was not authorized under § 41-22-19(d), Ala.Code 1975, to order a summary suspension of its license effective April 2, 1998, without affording KK a hearing, because, KK claims, there was no situation that presented a "danger to the public health, safety, or *1084 welfare." Section 41-22-19(d) provides, in pertinent part:
"(d) If the agency finds that danger to the public health, safety, or welfare requires emergency suspension of a license and states in writing its reasons for that finding, it may proceed without hearing or upon any abbreviated hearing that it finds practicable to suspend the license. The suspension shall become effective immediately, unless otherwise stated therein. The suspension may be effective for a period of not longer than 120 days and shall not be renewable.... When such summary suspension is ordered, a formal suspension or revocation proceeding under subsection (c) of this section shall also be promptly instituted and acted upon."
(Emphasis added.)
KK contends that § 38-7-11, Ala.Code 1975, rather than § 41-22-19(d), is applicable because it deals specifically with hazards to the safety or well-being of children in a child-care facility. Section 38-7-11 specifically authorizes DHR to inspect any child-care facility that is operating under a license. In pertinent part, that statute provides:
"If any such inspection of a licensed or approved child-care facility discloses any condition, deficiency, dereliction or abuse which is, or could be, hazardous to the health, the safety or the physical, moral or mental well-being of the children in the care of the child-care facility being inspected, the same shall at once be brought to the attention of [DHR], and [DHR] shall have the power to revoke without notice the license or approval or six-month permit of such childcare facility. In this event, the childcare facility shall not operate during the pendency of any proceeding for fair hearing or judicial review, except under court order."
§ 38-7-11, Ala.Code 1975 (emphasis added).
We need not decide this issue because a decision favorable to KK would provide it no practical relief. As the FHO's decision states, the summary suspension of KK's license expired as a matter of law shortly after the hearing officer rendered its decision revoking KK's nighttime-care license. Therefore, any consideration of whether the summary suspension was proper is moot. See Elf v. Department of Pub. Health, 66 Conn. App. 410, 419 n. 7, 784 A.2d 979, 986 n. 7 (2001) (finding a similar argument moot because the license of a day-care-home operator had already been revoked and, therefore, "a finding that the summary suspension was improper would afford her no practical relief").

II. Charge Letter: Compliance with the Notice Requirements of § 41-22-12(b), Ala.Code 1975
On appeal, KK maintains that DHR's April 2, 1998, charge letter did not cite to applicable legal authority for each of the individual charges listed in that charge letter, as required by § 41-22-12, Ala.Code 1975. Section 41-22-12(a), Ala. Code 1975, requires that in a contested case the agency must notify all parties of the hearing. That notice must include:
"(1) A statement of the time, place, and nature of the hearing;
"(2) A statement of the legal authority and jurisdiction under which the hearing is held;
"(3) A reference to the particular sections of the statutes and rules involved; and
"(4) A short and plain statement of the matters asserted. If the agency or other party is unable to state the matters in detail at the time the notice is *1085 served, the initial notice may be limited to a statement of the issues involved. Thereafter, upon application, a more definite and detailed statement shall be furnished."
§ 41-22-12(b), Ala.Code 1975.
Section 38-7-8, Ala.Code 1975, provides nine grounds for the revocation of the license of a child-care facility. That section provides:
"[DHR] may revoke ... the license... of any child-care facility ... should the [licensee] ...:
"(1) Consistently fail to maintain standards prescribed and published by [DHR];
"(2) Violate the provisions of the license issued;
"(3) Furnish or make any misleading or any false statements or report to [DHR];
"(4) Refuse to submit to [DHR] any reports or refuse to make available to [DHR] any records required by [DHR] in making investigation of the child-care facility for licensing purposes; provided, however, that [DHR] shall not revoke or refuse to renew a license in such case unless it has made a written demand on the person, firm or corporation operating the facility requesting such report or reports and such person, firm or corporation fails or refuses to submit such records for a period of 10 days;
"(5) Fail or refuse to submit to an investigation by [DHR];
"(6) Fail or refuse to admit authorized representatives of [DHR] at any reasonable time for the purpose of investigation;
"(7) Fail to provide, maintain, equip and keep in safe and sanitary condition premises established or used for child care as required under standards prescribed by [DHR], or as otherwise required by any law, regulation or ordinance applicable to such facility;
"(8) Refuse to display its license or permit; or
"(9) Fail to maintain financial resources adequate for the satisfactory care of children served in regard to upkeep of premises and provisions for personal care, medical services, clothing, learning experience and other essentials in the proper care, rearing and training of children."
The April 2, 1998, charge letter alleged that KK had violated § 38-7-8(1) by "consistently fail[ing] to maintain the standards prescribed and published by [DHR]." In its charge letter, DHR also maintained that KK had violated subsection (2) of § 38-7-8 by "violat[ing] the provisions of its license." The charge letter also accused KK of violating § 38-7-8(3) by furnishing or making misleading or false statements to DHR.
In Mobile County Department of Human Resources v. Mims, 666 So.2d 22, 27 (Ala.Civ.App.1995), this court stated:
"[N]otice of charges does not require the specificity of pleadings filed in a court of record, nevertheless, the requirement of due process limits the agency to a consideration of only those charges that it has included within the instrument that it has called upon a respondent to answer. White Way Pure Milk Co. v. Alabama State Milk Control Board, 265 Ala. 660, 93 So.2d 509 (1957). The charges must be sufficiently specific to apprise [the licensee] of the allegations against [it]. Williams v. City of Northport, 545 So.2d 65 (Ala.Civ.App.1989). Additionally, the complaint must allege facts that, if proven, are sufficient to establish the essential elements of the charges. See 2 Am.Jur.2d Administrative *1086 Law § 371 (1962); see also Federal Trade Commission v. Gratz, 253 U.S. 421, 40 S.Ct. 572, 64 L.Ed. 993 (1920), and Williams, 545 So.2d 65."

A. Consistent Failure to Maintain Standards
In that part of the charge letter in which DHR alleged that KK had consistently failed to maintain compliance with the Minimum Standards, DHR alleged that KK had violated the Minimum Standards in part by: (1) failing to provide staff supervision of children on two occasions: August 13, 1992, when a DHR social worker discovered unsupervised sleeping toddlers, and March 26, 1998, when the child was left unsupervised and locked in the KK facility (see Rule 660-5-25-.05(7)(a)2.(i)); (2) failing to maintain the appropriate child/staff ratios and groupings (see Rule 660-5-25-.05(7)(a)1. and Rule 660-5-25-.05(8)(d)2.(i) and (ii)); (3) failing to provide qualified staff because, at the time of the March 26, 1998, incident, one of the KK employees involved in that incident was not yet 19 years old, as is required by Rule 660-5-25-.05(5)(a)3. and Rule 660-5-25-.05(8)(b)1.; and (4) failing to free staff who were working with children from other duties, such as mopping or leaving the room to let parents in through the locked front door of the KK facility (see Rule 660-5-25-.05(7)(a)2.(ix)). The hearing officer, in reaching its decision, found that the evidence supported DHR's allegations as to the first three of the above-listed charges.
In support of each of the above-listed charges contained in the charge letter, DHR cited in the charge letter applicable provisions of the Minimum Standards. Therefore, as to those charges, we cannot agree with KK's argument that the charge letter did not contain appropriate references to supporting legal authority.

B. Violation of Provisions of KK's License
At the administrative hearing, DHR took the position that, by violating DHR regulations found in the Minimum Standards, KK had "violated the provisions of its license," thereby authorizing DHR to revoke KK's license pursuant to § 38-7-8(2), Ala.Code 1975. KK has not argued on appeal that a violation of the Minimum Standards does not constitute a violation of the provisions of its license; in fact, in its brief on appeal, KK did not mention the phrase "provisions of the license," and its brief does not contain any citation to § 38-7-8(2), Ala.Code 1975. Therefore, KK is deemed to have waived any argument it might have asserted with regard to that issue. Robino v. Kilgore, 838 So.2d 366 (Ala.2002) (appellant deemed to have waived an issue it failed to argue in its appellate brief); Ex parte Riley, 464 So.2d 92, 94 (Ala.1985) (The "failure to argue an issue in brief to an appellate court is tantamount to the waiver of that issue on appeal."); Boshell v. Keith, 418 So.2d 89, 92 (Ala.1982) ("When an appellant fails to argue an issue in its brief, that issue is waived.").
In alleging in its charge letter that KK had violated § 38-7-8(2), Ala.Code 1975, DHR maintained that KK had failed to ensure that its staff had access to the staff's and children's files (see Rule 660-5-25-.05(4)(c)); that the staff's and children's files did not contain current information (see Rule 660-5-25-.05(4)(c)); and that there was no daily, or nightly, schedule of activities for the children (see Rule 660-5-25-.05(7)(b)3.(i)(I)). DHR also maintained that, in violation of § 38-7-8(2), KK's staff failed to ensure that the child was not signed out of the facility and that KK's staff had not reviewed sign-out sheets to ensure that children were properly signed out of the KK facility (see Rule 660-5-25-.05(4)(g)); *1087 DHR also contended that KK had failed to properly orient or train its staff (see Rule 660-5-25-.05(5)(c)). In its decision, the hearing officer determined only one of those charges to be supported by the evidence presented at the hearing; the hearing officer determined that KK had violated the Minimum Standard provision requiring that each child be signed out each day upon his or her departure from the child-care facility.
The April 2, 1998, charge letter correctly cites provisions of the Minimum Standards in support of each of the allegations it made against KK with regard to the alleged violations of § 38-7-8(2), Ala.Code 1975. Therefore, we conclude that DHR properly supported with citations to appropriate legal authority the charges it made against KK in its charge letter alleging violations of § 38-7-8(2), Ala.Code 1975.

C. Misrepresentations to DHR
In the charge letter, DHR also alleged that KK had violated § 38-7-8(3), Ala. Code 1975, by furnishing false or misleading statements to DHR. DHR made three allegations under this subsection, but the hearing officer found only one to be substantiated by the evidence. That charge related to KK's maintaining on file signed statements by staff members that falsely verified that the staff members had read the Minimum Standards. We conclude that that charge is also supported by a proper citation in the charge letter to supporting legal authority, i.e., Rule 660-5-25-.05(4)(c)3.(ii)(VII), Ala. Admin. Code.
Given the foregoing, we conclude that the April 2, 1998, charge letter was legally sufficient to apprise KK of the charges against it, as required by § 41-22-12(b), Ala.Code 1975, and that it properly supported its charges by citations to appropriate legal authority.

III. Admission of Evidence Outside the Allegations Listed in the Charge Letter
KK argues that the hearing officer erred by allowing Billings to testify during the administrative hearing regarding certain incidents that, it contends, were not set forth in the charge letter. Specifically, KK maintains that the circuit court erred in allowing Billings to testify regarding the number of children in her care on various occasions; that testimony was arguably relevant to the inquiry whether KK had violated the child/staff ratios required by the Minimum Standards in Rule 660-5-25-.05(7)(a)1. and (8)(d)2.(i) and (ii).
Billings testified that on one occasion she and another child-care worker had responsibility for 50 children. Shortly after that testimony, KK objected, referencing the fact that it had, during DHR's examination of an earlier witness, objected to that witness's testimony pertaining to the issue whether KK had maintained proper child/staff ratios. In that earlier objection, KK had argued that although the April 2, 1998, charge letter alleged that KK had failed to maintain the child/staff ratios required by the Minimum Standards, the charge letter referenced only one specific incident: the incident on March 26, 1998, when the child was left alone in the nursery unsupervised. In response to that objection, the hearing officer stated:
"To prevail in this hearing, [DHR is] going to have to prove these allegations and these issues. I would not hold [DHR] so tightly that [it] cannot attempt to shore up [its] case by bringing out similar incidents. [DHR] can put all sorts of violations on. But if it has nothing to do with proving one of these allegations in [the charge letter], [DHR] cannot prevail. I am not saying that [DHR] can never say that something like this has happened in the past." *1088 KK responded by asserting that if it had had notice of the child/staff-ratio issue, it "would have had an opportunity to deal with it." We note that Billings testified on July 2, 1998, during the first day of the administrative hearing. The administrative hearing was continued until 20 days later, July 22, 1998. KK made no attempt to present evidence addressing or contradicting Billings's testimony regarding child/staff-ratio problems during the second day of the administrative hearing.
The hearing officer overruled the objection KK posed during Billings's testimony, and Billings then briefly testified regarding two other occasions during which KK had violated the child/staff ratios set forth in the Minimum Standards. However, it is not entirely clear whether those violations occurred after 7:00 p.m., which would make them relevant to the nighttime-care license, or earlier in the day.
In arguing that it did not have proper notice of DHR's allegation that it had not maintained the child/staff ratios required by the Minimum Standards, KK cites only Mobile County Department of Human Resources v. Mims, supra. In that case, DHR charged Mims, a high-school teacher, with abuse; the charges arose, in part, out of sexually inappropriate remarks Mims allegedly made to one of his students. Our supreme court concluded that those remarks were outside the statutory definition of "sexual abuse." Therefore, it concluded that DHR's charge letter accusing Mims of sexual abuse of the child was not sufficiently specific to apprise Mims of the charges against him. Mims, 666 So.2d at 27.
We find this case to be distinguishable from Mims. The allegation at issueâ that KK failed to maintain proper child/ staff ratiosâ is not outside the statutory or regulatory provisions cited in support of the allegation. KK contends that because DHR specifically mentioned only one incident in which KK had allegedly failed to maintain proper child/staff ratios, DHR did not provide KK notice that other, allegedly similar incidents might be referenced by that charge. However, the charge at issue is set forth in the same section of the charge letter that contains four other, similar allegations. Those allegations pertain to KK's alleged failure to maintain proper supervision of the children in its care; its failure to free the staff who are caring for children from other duties, as required by the Minimum Standards; and its failure to provide qualified staff, specifically, its hiring an 18-year-old and placing her alone in a classroom supervising infants and toddlers. Even assuming that KK did not have proper notice from the specific portion of the charge letter alleging that it had "fail[ed] to maintain" appropriate child/staff ratios, the charge alleging that it had hired an underage staff member to supervise children should have indicated to KK that the child/ staff ratios were in question for any time that the underage staff member was on duty and supervising children. See Rule 660-5-25-.05(5)(a)3. (providing that to be qualified to be a child-care worker or teacher with "primary responsibility" for caring for children, the staff member must be "at least 19 years of age").
In this portion of the opinion, we decide only that the April 2, 1998, charge letter sufficiently apprised KK that DHR was alleging that it had failed to maintain proper child/staff ratios, and, therefore, that the hearing officer could allow Billings's testimony on that matter into evidence. As we discuss later in this opinion, however, most of Billings's testimony as to this issue was vague and may not, by itself, provide appropriate support for a determination that KK violated the required child/ staff ratios.

*1089 IV. Admission of Hearsay

In order to prove its allegation that, on August 13, 1992, KK violated the Minimum Standards by failing to supervise sleeping toddlers, DHR submitted into evidence its Exhibit 4, a letter written to KK by Melinda Adams, the DHR licensing consultant who, following her August 13, 1992, inspection of the KK facility, authored a deficiency report on KK. That letter sets forth the deficiencies Adams noted in her August 1992 inspection. KK contends on appeal that the hearing officer erred by admitting DHR's Exhibit 4 into evidence without making the findings that, it says, are required by § 41-22-13(1), Ala.Code 1975. That section provides, in pertinent part:
"In contested cases:
"(1) The rules of evidence as applied in nonjury civil cases in the circuit courts of this state shall be followed. When necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible thereunder may be admitted (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs."

§ 41-22-13, Ala.Code 1975 (emphasis added).
The record reveals that Adams was available to testify at the administrative hearing and that DHR, in fact, planned to call her as a witness. However, because of time constraints, the parties agreed to admit DHR's Exhibit 4 in lieu of her testimony. When DHR offered Exhibit 4, KK objected on the ground that the Minimum Standard deficiencies noted in Adam's letter were "not clearly associated with a nighttime issue." KK made no other objection to the admission of Exhibit 4 into evidence. Thus, it did not object on the basis of hearsay, and it did not request that the hearing officer make findings, assuming such findings are required, that the evidence contained in Exhibit 4, although allegedly hearsay, was of a type admissible under § 41-22-13(1), Ala.Code 1975. When the hearing officer admitted Exhibit 4 into evidence, KK's attorney stated only "with our objection"; he cited no basis for that objection. It would be reasonable to assume, however, that in making that general objection, KK was relying on the same ground on which it had originally objected, i.e., whether the deficiencies detailed in Adams's letter were related to a nighttime event.
Even assuming, however, that KK intended to object to the admission of Exhibit 4 on grounds different from those it had already stated, it did not state any other specific grounds as a basis for that objection. In order to predicate error on the allegedly mistaken admission of evidence, Rule 103(a)(1), Ala. R. Evid., requires an objection "stating the specific ground of objection, if the specific ground [is] not apparent from the context." Further,
"`Rule 46, Ala. R. Civ. P., requires that a party state his grounds for any objection that he makes if he wishes to preserve as error the [circuit] court's overruling of his objection. When the grounds for an objection are stated, this impliedly waives all other grounds for the objection to the evidence, and the objecting party cannot predicate error upon a ground not stated in the [circuit] court but raised for the first time on appeal.'
"Nichols v. Southeast Property Management, Inc., 576 So.2d 660, 662 (Ala. 1991)."
Hall v. Duster, 727 So.2d 834, 837 (Ala.Civ. App.1999). Given KK's failure to object to the admission of DHR's Exhibit 4 on the basis of hearsay, we conclude that KK failed to preserve a hearsay argument with regard to the admission of that exhibit.

*1090 V. Whether the DHR Regulations Relating to the Operation of Child-Care Centers are Ultra Vires

KK contends that the Minimum Standards relating to the operation of nighttime-care centers are ultra vires and therefore void. It bases its argument on the difference in the definitions of "nighttime center" contained in the Minimum Standards and in the Child Care Act.
Rule 660-5-25-.05(3)(n), Ala. Admin. Code, defines "nighttime center" as "[a] child-care facility which is established to receive twelve or more children for care after 7 p.m." (Emphasis added.) The Child Care Act, which authorizes DHR to enact the Minimum Standards, defines a "nighttime center" as "[a] facility which is established to receive more than 12 children for nighttime care." § 38-7-2(12)(a), Ala.Code 1975 (emphasis added). If an agency promulgates rules or acts outside its jurisdictional limits as established by the enabling statute, the agency is said to be functioning ultra vires. See William F. Fox, Jr., Understanding Admin. Law § 17 (3d ed.1997).
KK maintains that the Minimum Standards are invalid because the Child Care Act allowed DHR to formulate regulations only for child-care facilities that receive "more than 12" children, but DHR purports to regulate, through the Minimum Standards, facilities caring for "12 or more" children. "It is settled law that the provisions of a statute will prevail in any case in which there is a conflict between the statute and a state agency regulation." Ex parte Crestwood Hosp. & Nursing Home, Inc., 670 So.2d 45, 47 (Ala. 1995). Therefore, the definition of "nighttime center" as it appears in Rule 660-5-25-.05(3)(n) may well be void insofar as it applies to a child-care center that receives exactly 12 children; given the facts of this case, however, we need not decide that issue in this opinion. KK does not fall within the narrow category of a child-care facility established to receive 12 and only 12 children. An appellate court may reverse, modify, or grant relief from an agency action "if the court finds that ... substantial rights of the petitioner have been prejudiced because the agency action is ... (2) [i]n excess of the statutory authority of the agency." § 41-22-20(k), Ala. Code 1975. Even assuming that KK has demonstrated that Rule 660-5-25-.05(3)(n) as it applies to a child-care facility established to receive exactly 12 children is ultra vires, or beyond DHR's statutory authority, it has failed to demonstrate that its substantial rights have been prejudiced by the application of the Minimum Standards to it, a child-care facility that undisputedly receives more than 12 children. Therefore, we conclude that KK has failed to demonstrate error as to this issue.

VI. Whether the License Revocation Was Correct and Supported by Substantial Evidence
In its decision, reached after an administrative hearing in which it heard testimony and received documentary evidence, the hearing officer set forth a lengthy factual history of this case under the heading "Findings of Fact." In that section, the hearing officer also made several conclusions that resolved some of the factual disputes at issue. At the end of the "Findings of Fact" section of the administrative decision, the hearing officer stated:
"There was conflicting testimony presented on some of the facts, but, in summary, I make the following factual findings:
"1. Staff supervision was not provided at all times, as evidenced by the fact that a twenty-three month old nighttime-care child was left locked in the [KK] Center in a crib, unattended, *1091 for over one hour during the late hours of March 26 and the early morning hours of March 27, 1998. I find that this placed the child in imminent danger.
"2. There were child/staff ratio violations at the [KK] Nighttime Center.
"3. A [KK] Nighttime Center staff member who was charged with the responsibility of looking after the children was under age nineteen. This staff member was Barbara Nicole Bolden.
"4. Some [KK] staff members made false or misleading statements when they signed that they had read the Minimum Standards, when in fact they had not.
"5. There were some Minimum Standards violations committed by [KK] as far back as 1992.
"6. DHR's investigation revealed that staff did not review the sign-out sheets to see that all children had been signed-out. This was obviously the case when Tiffany Billings left the facility with [the child] locked in the [KK] Center. [KK] presented evidence to show that [the child] was signed out after the police came and [Hines] picked up her child in the early morning hours of March 27, 1998; however, this is not evidence that the [KK] Center routinely reviewed sign-out sheets."
(Emphasis added.)
Also in its administrative decision, the hearing officer made the following conclusions of law:
"[DHR] has the statutory authority to revoke or refuse to renew the license of any child-care facility should that facility `consistently fail to maintain minimum standards prescribed and published by the Department.' § 38-7-8, Ala.Code 1975.
"The Minimum Standards ... state[ ]: `All children shall have staff supervision at all times.' This was clearly violated on March 26-27, 1998, when a twenty-three-month-old child was left in a crib, unattended, [and] locked in the [KK] Center. Also, as far back as August 13, 1992, the DHR representative observed sleeping toddlers unsupervised.
"The Minimum Standards ... give[ ] the following child/staff ratio `for Sleeping Children':

Age of Children Child/Staff Ratio
3 weeks - 6 months 1 adult to 6
6 months - 1 year 1 adult to 10
1 year - 2 years 1 adult to 15
2 years - 4 years 1 adult to 20
4 years and older 1 adult to 30

"According to the credible testimony of [KK] employee Tiffany Billings, at least some of these ratios were being violated.
"The Minimum Standards ... state[ ], `Child care workers or teachers who have primary responsibility for the care of groups of children shall be at least 19 years of age and shall have a high-school diploma or general education diploma (GED).' Further, `[d]uring hours when children are normally sleeping, the child/ staff ratio for sleeping children shall be met by staff persons meeting at least the child-care worker qualifications.' Barbara Bolden, who was assigned to work in the toddler room on March 26, 1998, was only 18 years of age.

"CONCLUSION
"[DHR] proved by a preponderance of the evidence that a twenty-three-month-old child was left unsupervised and locked in the [KK] Nighttime Center during the late evening hours of March 26 and early morning hours of March 27, *1092 1998. This clearly placed the child in imminent danger. This, along with the other violations of the [KK] Center, as enumerated, warrants the suspension of the nighttime license and the revocation of the license."
(Emphasis added.)
For purposes of analysis of KK's arguments pertaining to whether the evidence supports the findings made in the hearing officer's decision, we address the arguments in the order of the "summarized" factual findings as set forth in that decision. In doing so, we also consider the other factual findings contained in that administrative decision, as well as the evidence in the record.

A. Staff Supervision
KK argues that the evidence does not support the hearing officer's findings that KK did not adequately supervise the children in its care. Initially, we note that KK does not dispute that the March 26, 1998, incident occurred. In that incident, a child was left unsupervised in the KK nursery for approximately one and one-half hours after Bolden left the child alone in the nursery but during the time that Billings was still in the KK facility. That child was later locked in the KK facility, alone and unattended, for approximately one hour after Billings closed the facility and left on the night of March 26, 1998. Also, as the hearing officer noted in the administrative decision, DHR issued a deficiency report against KK in 1992, and one of the charges in that deficiency report was that KK had violated that provision of the Minimum Standards requiring that "[a]n adult must be in each room of sleeping children ages 3 weeks to 4 years." See Rule 660-5-25-.05(8)(d) 2.(iv)(III). When Bolden left the child alone in the KK nursery to go home on the night of March 26, 1998, the Minimum Standards were again violated because Billings was in another classroom.
On appeal, KK continues to argue vehemently, as it did at the administrative hearing, that although the Minimum Standards require that children be supervised "at all times," see Rule 660-5-25-.05(7)(a)2.(i), the term "supervision" is not defined in the Minimum Standards. Therefore, KK argues, it cannot be held responsible for any alleged inadequate supervision of children. KK took issue with DHR's interpretation of Rule 660-5-25-.05(7)(a)2.(i) that the rule requires staff to be present at all times to supervise the children in a child-care facility's care. DHR takes the position that another staff person should supervise the room if a child-care worker supervising a group of children has to leave the room for any reason. KK cross-examined the DHR witnesses at length regarding their perceptions of the reasonableness of DHR's interpretation of Rule 660-5-25-.05(7)(a)2.(i); that questioning included a plethora of hypothetical inquiries. The DHR witnesses, however, maintained that DHR's interpretation of the rule requiring that children in a child-care facility be supervised at all times required the constant presence of a qualified child-care worker.
Deference must be given an agency's interpretation of its own rules. Ex parte Board of School Comm'rs, 824 So.2d 759 (Ala.2001). "An agency's interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation." State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d at 180-81. See also Ex parte Board of School Comm'rs, supra.
KK has failed to persuade this court that DHR's interpretation of Rule 660-5-25-.05(7)(a)2.(i) as requiring the *1093 constant presence of a child-care worker to supervise children in the care of a child-care facility is not a reasonable construction of that rule.
Another basis for a finding of inadequate supervision is the evidence that the staff had to leave children unattended while the staff members retrieved snacks or cleaning supplies, went to the bathroom, or unlocked the facility's front door to admit parents, because there was no one else to supervise the class. The hearing officer noted that Billings and Bolden stated that it was the practice of the KK staff to leave children alone in the classroom in order to unlock the KK front door to admit parents seeking to pick up their children after 7:00 p.m. The hearing officer was unable to determine whether that specific situation resulted in the staff's inadequate supervision of the children in their care. However, in the next section of the administrative decision, the hearing officer found that Billings occasionally left children "unattended" to go to the kitchen to retrieve snacks or for "some other reason."

B. Child/Staff-Ratio Violations
The evidence also supports the hearing officer's conclusion that there had been child/staff-ratio violations at the KK facility.
Billings testified regarding several incidents in which she alleged that she and another child-care worker were left with 50-54 children and an occasion in which she alleged that she supervised 36 children alone for approximately 2 hours. The hearing officer referenced that testimony in its findings of fact. KK contends that that testimony could not support the hearing officer's finding that KK had violated the child/staff ratios, because, it maintains, that testimony was vague regarding the time of day those alleged violations occurred. We note that KK did not object on that basis. It objected only on the basis that it allegedly had no notice that the maintenance of child/staff ratios would be an issue at the administrative hearing; this issue has been addressed earlier in this opinion. Even assuming, however, that KK properly preserved an objection related to the timing of the alleged child/ staff-ratio violations and that the hearing officer improperly considered that evidence, we must conclude that, given the other evidence and findings, that error was harmless. Rule 45, Ala. R.App. P.
In the findings of fact in the administrative decision, the hearing officer also discussed previous child/staff-ratio problems discovered by a DHR social worker during an August 13, 1992, inspection of the KK facility; those deficiencies are set forth in DHR's Exhibit 4, which, as we discussed earlier in this opinion, was properly admitted into evidence. In reaching its decision, the hearing officer also noted the extensive testimony regarding the fact that the KK nighttime staff routinely left the children in their care alone in a classroom while the staff retrieved snacks from the kitchen or left the classroom to unlock the front door of the KK facility to admit a parent who had arrived after 7:00 p.m. to pick up a child.
Further, as the hearing officer found, Bolden, who was admittedly not 19 years old when she was hired or when the March 26, 1998, incident occurred, had been working at the KK facility for some time. According to Bolden's testimony, she alone was responsible for supervising the infant or toddler room on the night of March 26, 1998. Bolden also testified that her regular shift caused her to work for some portion of the nighttime hours. DHR took the position, at the administrative hearing and in its report based on McDaniel's March 30, 1998, investigation, that because she was not deemed a qualified *1094 child-care worker under the Minimum Standards, Bolden should not be counted as a staff member in determining the child/staff ratios maintained by KK. We agree with that position, and we conclude that the evidence pertaining to the KK staff leaving children unattended supports the hearing officer's conclusion that "[t]here were child/staff ratio violations at the [KK] Nighttime Center."

C. Unqualified Staff
The Minimum Standards, in defining the required qualifications of child-care workers with primary responsibility for caring for children, mandate that a child-care worker must be at least 19 years old. Rule 660-5-25-.05(5)(a)3. KK does not dispute that Bolden was not yet 19 years old when she began working at the KK facility or at the time of the March 26, 1998, incident. KK maintains that Bolden had experience babysitting children and that she was "almost" 19 at the time of the March 26, 1998, incident.[6] KK also contends that the hearing officer did not expressly find that Bolden was "primarily responsible" for supervising children and that that term is not defined in the Minimum Standards. Bolden testified, however, that she alone supervised the children in the infant or toddler room on the night of March 26, 1998, and her testimony indicated that she had supervised that room alone on previous occasions during nighttime hours when the ratio of children to staff members allowed another child-care worker to leave the infant or toddler classroom. It cannot be seriously argued that Bolden, as the sole child-care worker in a classroom, was not "primarily responsible" for supervising the children in that classroom. The hearing officer's finding that KK had employed an unqualified child-care worker is clearly supported by the evidence.

D. False or Misleading Statements to DHR
Pursuant to the authority of § 38-7-8(3), Ala.Code 1975, DHR may revoke the license of a child-care facility that "[f]urnish[es] or make[s] any misleading or false statements or report[s] to the department." The hearing officer determined that KK employees had made false and misleading statements when they signed statements that indicated they had read the Minimum Standards. It is undisputed that those employees, Billings and Bolden, had not read the Minimum Standards.
Rule 660-5-25-.05(4)(c)3.(ii)(VII) requires that the director of a child-care facility must maintain in a staff member's file "[w]ritten and signed verification stating that staff members have read the Minimum Standards." Another rule, which deals with the training required of child-care workers, also requires that a copy of a signed statement verifying that a staff member has read the Minimum Standards must be kept in that staff member's employment file. See Rule 660-5-25-.05(5)(c)2.(iii).
Bolden and Billings each testified that during their orientation at KK, Perry handed them a number of papers related to their employment to sign. One of the documents was a statement indicating that they had each read the Minimum Standards (that document is hereinafter referred to as "the verification statement"). Neither Bolden nor Billings was provided a copy of the Minimum Standards; the Minimum Standards do not explicitly require *1095 that a child-care facility provide a staff member a copy of the Minimum Standards when the facility asks the staff member to sign the verification statement. Billings testified that she understood that she had to sign the verification statement in order to maintain her employment and that she signed it and returned it to Perry even though she knew she had not read the Minimum Standards. Both Bolden and Billings returned the verification statement, along with other employment-related documents, during their orientation sessions. DHR maintained that the aforementioned rules require the child-care facility to ensure, or make some effort to ensure, that its staff members have actually read and have had an opportunity to become familiar with the Minimum Standards.
KK maintains that under the Minimum Standards it was required only to maintain, in its staff member's files, signed verification statements indicating that the staff members had read the Minimum Standards. KK insists that there is no requirement in the Minimum Standards that a child-care facility's staff members actually read the Minimum Standards; according to KK, the Minimum Standards demand only that a child-care worker sign a statement verifying that he or she has done so. KK further maintains that it cannot be held to be the guarantor of its employee's truthfulness, and that the Minimum Standards place no responsibility on a child-care facility to ensure that its employees read the Minimum Standards.
We cannot adopt such a narrow construction of the Minimum Standards as the one advanced by KK on this issue. Such an interpretation would render ineffective the requirement that a child-care facility maintain the verification statements in its employees' files. Also, we cannot say that DHR's interpretation is unreasonable. See State Dep't of Human Res. v. Gibert, supra; State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., supra. It is clearly reasonable to interpret regulations that require a child-care facility to maintain the verification statements as requiring the staff member who signed that verification statement to have, in fact, actually read the Minimum Standards. Further, the child-care facility, as the employer, is in the best position to ensure the truthfulness of that statement and, thereby, the safety of the children in its care.
Also, the evidence in this case supports a conclusion that KK knew or should have known that its staff members' signatures on those verification statements were false. KK did not provide its staff members with copies of the Minimum Standards; a copy of the Minimum Standards was at the front desk, but it is not clear that Bolden or Billings understood that. KK is correct that there is no requirement in the Minimum Standards that a child-care facility provide its employees with copies of the Minimum Standards. However, both Bolden and Billings returned the signed verification statements almost immediately to Perry; thus, the evidence supports the conclusion that Bolden and Billings did not have an opportunity to find and read the Minimum Standards before signing those verification statements, and that that would be obvious to KK.
KK also argues that even assuming KK should be responsible for its staff's failure to read the Minimum Standards, it did not "furnish or make" a misleading or false statement to DHR. See § 38-7-8(3). KK is correct that it did not furnish the verification statements to DHR in the form of a report that might be required under Rule 660-5-25-.05(4)(d). However, during the course of McDaniel's investigation of the March 26, 1998, incident, those verification statements, which KK concedes were false, *1096 were provided to DHR, and they were used as evidence in the administrative hearing.

E. Violations in 1992
The hearing officer determined that some violations of the Minimum Standards were discovered during DHR's August 13, 1992, inspection of KK's facility. We have already determined that the 1992 deficiency report, which has been referenced in this opinion as DHR's Exhibit 4, was properly admitted into evidence. That report noted three violations, all of which arose out of the same inspection on one dateâ August 13, 1992. According to the deficiency report resulting from the August 13, 1992, inspection, DHR noted the following violations of the Minimum Standards: that a posted menu was not dated; that one staff member was impermissibly supervising two rooms of sleeping children ages 3 weeks to 4 years, even though the Minimum Standards require that a staff member must be present in each room of sleeping children; and that although two staff members were required to be present in the KK facility after 9:00 p.m. if 9-12 children were present, only one staff member was present. In response to the August 1992 deficiency report, KK sent a letter to DHR indicating that it had corrected all three deficiencies noted in that deficiency report.
In paragraph five of its "findings of fact," the hearing officer noted that KK had committed some violations of the Minimum Standards "as far back as 1992." In the "conclusions of law" section of its decision, the hearing officer again cited one of those violationsâ sleeping toddlers left unsupervisedâ as another example, in addition to the March 26, 1998, incident, of KK's violation of the provision of the Minimum Standards requiring it to maintain staff supervision of the children in its care.
On appeal, KK makes a few brief arguments related to its contention that the August 1992 deficiency report was deficient in several aspects. It did not make those arguments before the hearing officer or the circuit court. Also, it does not appear that KK made those arguments in 1992; therefore, those arguments are not now timely raised. In fact, KK's letter in response to the August 1992 deficiency report did not dispute or challenge any of the findings in that report; it stated only that the deficiencies had been corrected.

F. Review of Sign-Out Sheets
The Minimum Standards require that "[t]he center shall require the custodial parent/guardian or other designated person to sign children out at each departure from the center." Rule 660-5-25-.05(4)(g). DHR interpreted that standard as requiring a child-care facility to review a sign-out sheet on a daily basis to ensure that all children had been signed out upon their departure from the child-care facility. The hearing officer agreed, and it found in the administrative decision that it did not appear that KK had regularly reviewed the sign-out sheets to ensure compliance with the Minimum Standards.
With regard to parents' signing children out of the KK facility, Billings testified that the sign-out sheet was posted near the door to the infant or toddler room in which she worked. Billings testified that the child-care workers were supposed to check to ensure that parents had signed the sign-out sheets when they picked up their children, but she later contradicted that testimony by stating that she had never been instructed to check the sign-out sheet to ensure that all the children in her care had been picked up and signed out of the KK facility. She stated that some parents did sign their children out each night, but that others did not. Therefore, Billings testified, by simply reviewing *1097 a sign-out sheet maintained by KK, a KK employee would not have been able to determine whether all of the children had been picked up from the KK facility. In addition to the foregoing evidence, KK's attorney questioned the DHR witnesses extensively regarding whether those witnesses thought it was reasonable for a child-care facility to be responsible for ensuring that a parent signed a child out of the facility; those witnesses responded affirmatively.
The remaining testimony concerning sign-out sheets pertained to whether Hines signed the KK facility's sign-out sheet after she picked up the child in the early hours of the morning after the March 26, 1998, incident. McDaniel testified that although representatives of KK had stated during her investigation on March 30, 1998, that KK had a sign-out sheet for the evening of March 26, 1998, she was not shown that sign-out sheet. Landrum and Perry each testified that Hines signed the sign-out sheet in the early hours of the morning following the March 26, 1998, incident, after she picked up the child. KK has not alleged, and it cannot be said, that the child could have been signed out on that sign-out sheet before the child was locked inside the KK facility on the evening of March 26, 1998. We note that Perry testified that the sign-out sheet that purportedly contained Hines's signature from the early hours of the morning following the March 26, 1998, incident was misplaced during the course of this litigation.
In its decision, the hearing officer determined that it was clear that on the evening of March 26, 1998, Billings did not review the sign-out sheets before she left for the evening and locked the child in the KK facility. The hearing officer also found that although the evidence indicated that Hines signed the child out after the March 26, 1998, incident, "[that] was not evidence the [KK staff] routinely reviewed the sign-out sheets."
KK argues on appeal, as it did extensively at the administrative hearing, that DHR's interpretation of Rule 660-5-25-.05(4)(g) is incorrect. KK argues that that rule does not explicitly require even the use of a sign-out sheet, and that it does not require a child-care facility to conduct a review of a sign-out sheet to ensure that children have been properly signed out of a facility upon their departure from the facility.
As stated earlier, however, an agency's interpretation of its rules and regulations is entitled to deference, and it must stand if it can be said to be reasonable. Ex parte Board of School Comm'rs, supra; State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., supra. The Minimum Standards mandate that the child-care facility "shall require" a parent, guardian, or custodian to sign a child out of the child-care facility. Rule 660-5-25-.05(4)(g). The use of the word "shall" is considered presumptively mandatory. Ex parte Achenbach, 783 So.2d 4 (Ala.2000) (citing Hornsby v. Sessions, 703 So.2d 932, 939 (Ala.1997)).
We cannot agree with KK's argument that it had no responsibility to have a sign-out sheet or to review that sign-out sheet to ensure that the parents had complied and signed their children out when they left the KK facility. A review by the child-care facility of the sign-out sheets would seem to be the only means to ensure the required compliance with Rule 660-5-25-.05(4)(g). Further, the KK staff's review of a properly maintained sign-out sheet before closing the facility for the night would be one method by which to prevent an occurrence such as the March 26, 1998, incident. The Minimum Standards regulate child-care facilities in a *1098 manner designed to protect the children in the care of those facilities; the interpretation of Rule 660-5-25-.05(4)(g) advocated by KK and by the dissent would defeat that purpose. KK and the dissent's interpretation also renders Rule 660-5-25-.05(4)(g) nothing more than a requirement that child-care centers generate meaningless paperwork. We cannot agree with an interpretation that would construe Rule 660-5-25-.05(4)(g) as requiring merely that the sign-out sheets be filled out and maintained, but not that the child-care-facility staff review them to ensure the safety of the children in the facility's care by verifying that each child was picked up by an appropriate person. Even in contending that Rule 660-5-25-.05(4)(g) does not require a child-care facility to review sign-out sheets to ensure compliance with the Minimum Standards, which would operate to safeguard the children in the child-care facility's care, the dissent acknowledges that DHR's interpretation of the rule "might accord with common sense and safe practice." 874 So.2d at 1106.
The dissent cites Bradberry v. Director, Office of Workers' Compensation Programs, 117 F.3d 1361 (11th Cir.1997), in support of its assertion that DHR had no official policy with regard to the review of sign-out sheets; it implies that deference is due an agency's interpretation of its own regulations only when the agency has made a written interpretation of its regulations or has a long-standing policy on an issue. The standard of review of an agency action set forth in Bradberry is similar to that contained in the Alabama precedent already cited in this opinion. See Ex parte Board of School Comm'rs, supra; State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., supra. In context, Bradberry states:
"We have held previously that `[i]t is well-established that courts must defer to an agency's consistent interpretation of its own regulation unless it is plainly erroneous or inconsistent with the regulation.' Lollar [v. Alabama By-Products Corp.], 893 F.2d [1258,] 1262 [(11th Cir.1990) ] (internal quotation marks omitted). Such deference is due particularly when the agency `has made a written interpretation of the regulation or has maintained a longstanding policy of the subject.' McKee v. Sullivan, 903 F.2d 1436, 1438 n. 3 (11th Cir.1990). However, we need not defer to a `mere litigating position.' William Bros., Inc. v. Pate, 833 F.2d 261, 265 (11th Cir.1987) (finding no deference due when the Director adopted a novel litigating position on the definition of `coal mine dust'); see also McKee, 903 F.2d at 1438-39 n. 3 (finding no deference due the Director's view on the evidence required to prove death when the agency cites only two district court cases to establish its position)."
117 F.3d at 1366 (emphasis added).
In Idaho Department of Health & Welfare v. United States Department of Energy, 959 F.2d 149, 152 (9th Cir.1992), the United States Court of Appeals for the Ninth Circuit also expressed a similar standard of review, stating, "[I]f an agency's interpretation is a reasoned and consistent view of its regulations, we will not substitute our own interpretation for that of the agency's." In that case, however, the court concluded that, given the appellant agency's longstanding practices and the "extreme position" it had taken in the litigation before the court, as distinguished from litigation the agency had previously been involved in, the appellant agency's interpretation was entitled to no deference because that interpretation was merely a litigation position. 959 F.2d at 153.
In this case, there is no evidence that DHR's interpretation of Rule 660-5-25-.05(4)(g) *1099 was merely a position taken during the course of this litigation. Contrary to the assertion made in the dissent, the testimony of McDaniel regarding the sign-out sheets and the position taken by DHR, both below and on appeal, are not inconsistent and do not indicate that DHR had "no official policy with regard to sign-out sheets prior to this litigation." 874 So.2d at 1107. The dissent quotes a portion of McDaniel's testimony in which she acknowledged that the language of Rule 660-5-25-.05(4)(g) does not explicitly require a child-care facility to review sign-out sheets. However, the portion of McDaniel's testimony that immediately precedes that portion quoted by the dissent indicates that McDaniel interpreted Rule 660-5-25-.05(4)(g) as requiring a review of the sign-out sheets by a child-care facility's staff:
"Q. [BY ATTORNEY FOR KK]: [T]he charge letter, page 3, says the investigation also revealed the staff did not review the sign-out sheet to see that all of the children had been signed out. That is Tiffany Billings did not review something. Isn't that the shorthand way of saying it?
"A. That is correct.
"Q. I mean, Tiffany Billings should have, before she cut the lights out; cut the alarm on; locked the door; clocked out and locked the door on March 26 or 27, how late at night there it was, that is her fail down, right? Her fall down. She should have reviewed that sign-out sheet, right?
"A. If she knew to.
"Q. Yes or no. Should she have reviewed it or not?
"A. Yes, she should have.
"Q. And she did not, right?
"A. That is correct.
"Q. And that was Tiffany Billings's failure, correct?
"A. Tiffany was employed by the center.
"Q. But that is Tiffany, the human being's, responsibility that she failed to fulfill?
"A. I would say that it would be the day-care center's responsibility because they hired that person."
Immediately following that testimony, the attorney for KK asked McDaniel to identify the specific language in Rule 66-5-25-.05(4)(g) that required a child-care facility's staff to review sign-out sheets. The exchange between KK's attorney and McDaniel quoted in the dissent indicates McDaniel's response to the line of questioning pertaining to whether the specific language of the Minimum Standards explicitly mentions the review of the sign-out sheets.
Thus, the record indicates that McDaniel's interpretation of Rule 660-5-25-.05(4)(g) was the same as that advanced by DHR. The testimony quoted in the dissent indicates that McDaniel acknowledged that there was no explicit requirement in the Minimum Standards that a child-care facility's staff review the sign-out sheets, but that she and DHR interpreted the rule as requiring a child-care center to review the sign-out sheets to ensure that parents had complied. Further, in her testimony, Debbie Thomas, the DHR supervisor in charge of child-care licensing, also advanced the interpretation of Rule 660-525-.05(4)(g) advocated by DHR on appeal. Thomas stated that "[if] a parent fails to sign out, then the center is not meeting the [Minimum Standards]," and that "[i]f one child does not sign out, you would not be meeting the [Minimum Standards]." Thus, the record indicates that DHR has maintained a consistent interpretation of Rule 660-5-25-.05(4)(g).
*1100 Given the foregoing, we cannot say that DHR's interpretation of Rule 660-5-25-.05(4)(g) as placing the responsibility of compliance with that rule on the licensed child-care facility is unreasonable. Ex parte Board of School Comm'rs, supra; State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., supra. Moreover, given the evidence from the administrative hearing, we cannot say that the hearing officer's determination that KK failed to routinely review sign-out sheets was incorrect.

G. Consistent Failure to Maintain Minimum Standards
KK also maintains in its brief on appeal that DHR failed to demonstrate that it "consistently failed" to maintain the standards prescribed by DHR. See § 38-7-8(1). We note that in making its argument on this issue, KK acknowledges what it contends is its only violation of the Minimum Standards: leaving the child alone and locked in the KK facility on the night of March 26, 1998. We have already determined that the evidence supports a conclusion that KK committed violations other than the one it acknowledges in this argument. Thus, KK asks this court to reweigh the evidence before the hearing officer and substitute our judgment for that of the agency, which the applicable standard of review does not allow this court to do. See Colonial Mgmt. Group, L.P. v. State Health Planning & Dev. Agency, supra. See also Bradberry v. Director, Office of Workers' Comp. Programs, supra; Idaho Dep't of Health & Welfare v. United States Dep't of Energy, supra.
KK also argues that the failure of DHR to define in the Minimum Standards the phrase "consistent failure" renders the hearing officer's decision "arbitrary" and justifies a reversal. KK is correct that the Minimum Standards do not explicitly define the phrase "consistent failure." In its brief on appeal, KK invites this court to define the phrase "consistent failure." In doing so, KK has not advocated any definition of that phrase and has performed no research to assist this court in defining the phrase. The dissent, in its words, "[t]iptoe[s] around traditional principles" of this State's well-settled precedent by advocating the reversal of the circuit court's and the hearing officer's decisions based on its creation of an argument for KK and its interpretation of the term "consistent failure." 874 So.2d at 1108. See McLemore v. Fleming, 604 So.2d 353 (Ala.1992) (holding that it is not the function of the appellate courts to create arguments for an appellant); Spradlin v. Spradlin, 601 So.2d 76, 79 (Ala.1992) (an appellate court may not "create legal arguments for a party based on undelineated general propositions unsupported by authority or argument"); Gonzalez v. Blue Cross/Blue Shield of Alabama, 760 So.2d 878, 883 (Ala.Civ.App.2000) ("It is well established that it is not the function of an appellate court to create, research, or argue an issue on behalf of the appellant."). Given that KK has failed to properly present this court with an argument on this issue, we decline KK's request that this court perform its legal research and create an argument on its behalf.
We have carefully examined the record on appeal with regard to the arguments advanced in KK's brief on appeal on the issue whether the administrative decision was supported by the evidence in the record. We conclude that KK has failed to demonstrate that the evidence does not support the revocation decision.

VII. Alleged Bias of FHO
KK also contends in its brief on appeal that the FHO who reviewed the hearing officer's administrative decision was biased because the FHO allegedly had been contacted by a DHR representative during *1101 the course of these, or possibly other, proceedings.[7] KK argues that the circuit court should have allowed it to engage in discovery to determine the extent of any possible ex parte communications between DHR and the FHO and to determine any potential bias of the FHO.
In its appellate briefs, KK has not directed this court to any evidence in the record indicating that it objected before the FHO to any possible bias on the part of the FHO. Also, KK made no reference in its motion before the circuit court to any pleading or motion it presented to the FHO on the issue of his possible bias. The record includes almost 2,200 pages of pleadings, motions, testimony, and evidence. It is not the duty of this court to search an appellate record for evidence to support an appellant's contentions of error. Jenkins v. Landmark Chevrolet, Inc., 575 So.2d 1157 (Ala.Civ.App.1991); Johnson v. Life Ins. Co. of Alabama, 581 So.2d 438 (Ala.1991). See also Rule 28(a)(10), Ala. R.App. P. (providing that an appellant's argument must contain citations to the parts of the record upon which the appellant relies). However, out of an abundance of caution, we examined the record with regard to this issue. The record indicates that the FHO was asked to review an appeal of DHR's denial of a nighttime-care license for an entity known as "Kids' Klub II." Our review of the record with regard to this issue revealed only a March 5, 1999, letter on behalf of Kids' Klub II, written by the same attorney representing KK in this matter, stating that Kids' Klub II waived the recusal of the FHO with regard to its appeal; that letter requested that the FHO disclose any ex parte communications he might have had with representatives of DHR. However, the March 5, 1999, letter to the FHO was made in regard to Kids' Klub II, and it contains no reference to KK or its appeal that was also at that time pending before the FHO. Our review of the record has failed to disclose that KK raised any issue related to the FHO's possible bias before the FHO that would provide the FHO the opportunity to consider the issue. Thus, for all that appears in the record on appeal, KK first alleged possible bias on the part of the FHO in the circuit court and only after the FHO had returned a decision that was unfavorable to it. Therefore, we cannot say that KK has demonstrated that the circuit court erred in denying KK's request to conduct discovery regarding any possible bias on the part of the FHO.

VIII. Conclusion
Given the foregoing, we conclude that KK has failed to demonstrate that the evidence in the record did not support the findings of fact and the conclusions in the administrative decision and that it has failed to show any legal error in the administrative decision or in the circuit court's judgment that warrant a reversal. Therefore, we cannot say that the circuit court erred in determining that the administrative decision was not "illegal, capricious, or unsupported by the evidence." See § 38-7-9, Ala.Code 1975; Kid's Stuff Learning Ctr., Inc. v. State Dep't of Human Res., supra.
AFFIRMED.
THOMPSON, J., concurs.
YATES, P.J., and PITTMAN, J., concur in the result.
CRAWLEY and MURDOCK, JJ., dissent.
*1102 CRAWLEY, Judge, dissenting.
I dissent because I believe the hearing officer erred by determining that DHR complied with the notice requirements of § 41-22-12(b) and by concluding that the license revocation was supported by substantial evidence.

I. Whether DHR Complied With the Notice Requirements

KK argues that DHR's "charge letter" failed to provide it with the legal authority and factual basis for its charges. I agree, but only with respect to section D of the charge letter, which alleged that KK had "violated the provisions of its license" by not adhering to five Minimum Standards having to do with access to files, activity schedules, sign-out sheets for children, and staff orientation and training.
At the administrative hearing, DHR took the position that, by violating DHR regulations found in the Minimum Standards, KK had "violated the provisions of its license," thereby authorizing DHR to revoke its license pursuant to § 38-7-8(2). In other words, DHR contended that the Minimum Standards are "the provisions of the license" that a licensee is required to meet. That contention is erroneous as a matter of law.
Based on a reading of the applicable statutory provision and DHR's own regulations, it is clear that the "provisions of a license" are those portions of the license authorizing a certain type of child-care facility and specifying the number and age range of children to be served at that facility. Section 38-7-4, Ala.Code 1975, provides:
"If, upon ... examination of the facility and investigation of the persons responsible for care of children, the department is satisfied that the facility and the responsible persons reasonably meet standards prescribed for the type of child-care facility for which application is made, the department shall issue a license or an approval in the proper form, designating on said license or approval the type of child-care facility and, except for a child-placing agency, the number of children to be served at any one time."

(Emphasis added.) Rule 660-5-25-.05(12)(e), Ala. Admin. Code, entitled "Provisions of the License," states:
"1. Licenses issued by [DHR] to day care centers and nighttime centers are valid for two years from the date of issuance, unless revoked by [DHR] or voluntarily surrendered by the licensee.
"2. The number of children in the center at any given time shall not exceed the number specified on the license.
"3. The age range of the children served shall not vary from the limits specified on the license.
"4. The license is not transferable from one individual or group or corporation to another, nor from one building to another."
The record contains a copy of a license, signed by Martha Nachman, DHR Commissioner, on February 3, 1997, stating that the license was to be in force for a period of two years, from October 13, 1996, to October 13, 1998. The license states:
"This is to certify that The Kids' Klub, Inc., is hereby granted this license to conduct and maintain The Kids' Klub, Inc. Nighttime as a nighttime center for 45 children, ages 1 week-12 years at 1920 Central Parkway, Decatur, County of Morgan, State of Alabama."
Three blank spaces on the form contain designations for "Type of Child Care Facility," "Number [of children]" and "ages [of children]." Those blanks were filled with the words emphasized above. Accordingly, the provisions of KK's license *1103 were that it was to be (1) a nighttime center, (2) for 45 children, and (3) the ages of the children served by the facility could range from 1 week to 12 years. DHR neither alleged nor proved that KK violated those provisions. Because the charge letter erroneously equated a failure to adhere to any of the Minimum Standards with a violation of the "provisions of the license," the charge letter was, in that respect, legally insufficient to state any ground for revocation under 38-7-8(2).
I do not believe that KK has waived any argument with respect to whether DHR proved that, by violating the Minimum Standards, KK thereby violated the "provisions of [its] license." Relying on Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), and other authorities, KK argues that it was denied the due process of law guaranteed by § 41-22-12(b)(3) and (4). KK argues that, because the charge letter gave it no reference to the statutory, regulatory, or factual basis for believing that it violated the "provisions of [its] license," it was, therefore, unable to defend against that portion of the charge.

II. Whether the License Revocation was Supported by Substantial Evidence

The hearing officer made the following factual findings:
"1. Staff supervision was not provided at all times, as evidenced by the fact that a twenty-three month old nighttime child care child was left locked in the [KK] Center in a crib unattended for over one hour during the late hours of March 26 and early morning hours of March 27, 1998. I find that this placed the child in imminent danger.
"2. There were child/staff ratio violations at the [KK] Nighttime Center.
"3. A [KK] Nighttime Center staff member who was charged with the responsibility of looking after the children was under age nineteen. This staff member was Barbara Nicole Bolden.
"4. Some [KK] Staff made false or misleading statements when they signed that they had read the Minimum Standards when in fact they had not.
"5. There were some Minimum Standard violations committed by [KK] as far back as 1992.
"6. DHR's investigation revealed that staff did not review the sign-out sheets to see that all children had been signed out. This was obviously the case when Tiffany Billings left the facility with [the child] locked in the Center. [KK] presented evidence to show that [the child] was signed out after the police came and [Hines] picked up her child in the early morning hours of March 27, 1998; however, this is not evidence that the Center routinely reviewed the sign-out sheets."
The hearing officer's first factual finding is undisputed. The child was left unattended for approximately one hour on the night and early morning of March 26-27, 1998. That event clearly violates the Minimum Standards requirement that there be staff supervision of all children at all times.
The hearing officer's third finding of factâ that Barbara Bolden, an 18-year-old, was unqualified to be a child-care worker according to the Minimum Standardsâ is also supported by the evidence. Throughout these proceedings, DHR has taken the position that, because Bolden was an unqualified child-care worker, there was, in fact, no child-care worker supervising the children assigned to Bolden. Thus, DHR claims, KK violated the child/staff-ratio requirements of the Minimum Standards because Bolden, who was not an adult, could not be counted in determining the ratio of adults to children.
*1104 To the extent that the hearing officer's second finding of factâ that there were "child/staff ratio violations at the [KK] Nighttime Center"â was based upon Bolden's not being an adult, the second finding is supported by the evidence. However, to the extent that the second finding was based upon Tiffany Billings's testimony as to other ratio violations not alleged in the charge letter, it is, in my opinion, not supported by substantial evidence. As the main opinion states, "most of Billings's testimony as to this issue was vague and may not, by itself, provide appropriate support for a determination that KK violated the required child/staff ratios." 874 So.2d at 1088.
The hearing officer's fourth factual finding is based upon section C(1) of DHR's charge letter. Section C(1) states:
"The Code of Alabama 1975, Section 38-7-8(3), states that the Department may revoke the license of any child care facility that furnishes or makes any misleading or false statements to the Department.
"1. The investigation by the Department's representative revealed that staff members had on file at the center, signed statements verifying that they had read the Minimum Standards; however, when those same staff persons were interviewed by the Department's representative, they acknowledged signing the statements, but denied ever having seen or read the Minimum Standards."
The fourth finding of fact states:
"4. Some [KK] Staff made false or misleading statements when they signed that they had read the Minimum Standards when in fact they had not."
"Reading the Minimum Standards" is mentioned twice in the DHR regulations. First, Rule 660-5-25-.05(4)(c)3.(ii)(VII) states that the director of every child-care facility shall maintain records on the staff, including "[w]ritten and signed verification stating that staff members have read the Minimum Standards." Second, Rule 660-5-25-.05(5)(c)1., Ala. Admin. Code, states that all "[c]hild-care workers shall obtain at least 4 clock hours of training each year." Rule 660-5-25-.05(5)(c)2. states:
"Training shall be provided through, but need not be limited to, the following means:
"(i) Staff communications at planned scheduled meetings;
"(ii) Materials concerning child growth and development/early childhood education, available for, and used by staff; and
"(iii) Reading of the Minimum Standards for Day Care Centers and Nighttime Centers: Principles, Regulations, and Procedures. A signed statement verifying that the staff member has read the Minimum Standards shall be placed in each staff member's file."
At the administrative hearing, Barbara Bolden and Tiffany Billings testified that they had signed statements indicating that they had read the Minimum Standards. Both conceded, however, that they had not read the Minimum Standards. The evidence is undisputed that KK retained the signed statements in Bolden's and Billings's files.
The interpretation of an administrative regulation is a question of law. United States v. Bruno's, Inc., 54 F.Supp.2d 1252 (M.D.Ala.1999). I conclude that, as a matter of law, the fourth factual finding states neither a violation of the provision of the Minimum Standards charged nor a ground to revoke KK's license under § 38-7-8(3).
The ground for license revocation stated in § 38-7-8(3) has three components. The *1105 licensee must (1) "furnish or make" (2) a "misleading or ... false statement[ ] or report" (3) to DHR. The subsection (3) basis for revocation is concerned with reporting requirements rather than record-keeping requirements. See William F. Fox, Understanding Administrative Law § 20[A] and [B] at 110 (3d ed.1997) (distinguishing between record keeping and reporting requirements). Compare Rule 660-5-25-.05(5)(d)(outlining the content of monthly and other reports to DHR). The false statements Bolden and Billings signed were not furnished or made by KK to DHR. The fact that the false statements "came to light" as a consequence of McDaniel's investigation does not constitute KK's "furnish[ing] or mak[ing]" the statements to DHR.
By placing the signed statements in Bolden's and Billings's files, KK did what it was required to do under the second sentence of Rule 660-5-25.05(5)(c)2.(iii). A violation of that regulation was the only charge DHR leveled against KK with regard to "reading the Minimum Standards." I agree with the main opinion that the Minimum Standards do require a licensee to see that its employees are knowledgeable about the Minimum Standards. That requirementâ that a licensee ensure that its employees are familiar with the Minimum Standardsâ is found in subsections (i) and (ii), and in the first sentence of subsection (iii), of Rule 660-5-25-.05(5)(c)2., all of which relate to training employees. The requirement is not found in the second sentence Rule 660-5-25-.05(5)(c)2.(iii), which relates to record keeping of employees' statements. DHR charged KK with a violation of the second sentence of subsection (iii). The undisputed evidence established that KK did not violate the record-keeping requirement. Simply put, DHR should have charged KK with a violation of the requirement stated in the first sentence of Rule 660-5-25-.05(5) (c)2.(iii) (that KK failed to provide in-service training to Bolden and Billings "through reading the Minimum Standards").
I disagree with the main opinion that DHR's failure to charge a violation of the appropriate subsection can be cured by a tortured construction of the inappropriate subsection that was charged. In construing an agency regulation, a reviewing court is not at liberty to alter an existing regulation to require something more than the stated requirement because it determines that an "expanded" requirement is a good idea or is what the agency intended to charge. "`If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express.'" Phelps Dodge Corp. v. Federal Mine Safety & Health Review Comm'n, 681 F.2d 1189, 1193 (9th Cir.1982) (quoting Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n, 528 F.2d 645, 649 (5th Cir.1976)). I would hold that the hearing officer erred by equating the false statements by Bolden and Billings to false and misleading statements by KK to DHR.
The hearing officer's fifth factual findingâ "that there were some Minimum Standards violations committed by [KK] as far back as 1992"â is not supported by the evidence insofar as it implies that DHR proved more than one 1992 violation. The hearing officer relied on only one violation in 1992, that of "sleeping toddlers unsupervised on August 13, 1992."
The hearing officer's sixth factual findingâ "that staff did not review the sign-out sheets to see that all children had been signed out" before they closed the center for the nightâ although supported by the evidence, states no violation of the Minimum Standards and is, as a matter of law, *1106 not a basis for license revocation. The only DHR regulation relating to "sign-out sheets" is found at Rule 660-5-25-.05(4)(g):

"Transportation Provided by Parent(s), Guardian(s) or Other Designated Person(s). Children being transported by parent(s), guardian(s) or other designated person(s) shall be accompanied into and out of the center by this parent, guardian or other person. The center shall require the custodial parent/guardian or other designated person to sign children out at each departure from the center."

(Second emphasis added.)
Although it might accord with common sense and safe practice to have a regulation requiring staff members, before they close and lock the center for the night, review the sign-out sheets to see that all children have departed, there is no such requirement in the Minimum Standards. DHR consultant Beverly McDaniel conceded that fact at trial. Although McDaniel testified that Billings "should have" reviewed the sign-out sheets before she locked the center and left for the night on March 26, 1998, McDaniel candidly admitted that the Minimum Standards do not require such a review. McDaniel was asked, "Where [in the Minimum Standards] does it say that [an employee] had a responsibility to review the sign-out sheet as you've alleged in the charge letter?" McDaniel answered, "The standards do[ ] not address that." (Emphasis added.) McDaniel further testified:
"Q. [On cross-examination by counsel for KK]: And you agree with me, do you not, that the Minimum Standards do not require any nighttime staff member to review anything before a child leaves the facility?
"A. Yes, sir.
"Q. You agree with me, right?
"A. Yes, sir."
McDaniel also testified that Billings "should have" checked the cribs in the infant room to see that all children had been picked up before she left for the night, but DHR did not charge KK with violating any provision of the Minimum Standards requiring a crib check or a room check, presumably because there is no such requirement. The provision of the Minimum Standards that KK violated on March 26, 1998, was the requirement that children not be left unsupervised. McDaniel's testimony regarding what Billings "should have" done with respect to checking sign-out sheets, rooms, or cribs boils down to the fact that Billings left a child unsupervised. To guard against leaving a child unsupervised, there may have been any number of prudent but not, strictly speaking, "required" actions that Billings could have or should have taken. DHR charged the greater offenseâ leaving a child unsupervised and alone on March 26-27, 1998â in two separate sections of the charge letter: section A and section B(2). Then, in other sections of the charge letter, DHR attempted to parse the greater offense into what DHR considered its component parts: failing to check the parental sign-out sheets (section D(4)); failing to have "current file information available to night staff for the 23-month-old child left in the center" (section D(2)); and sending a misleading "memorandum to parents" about the events of March 26-27, 1998 (section C(3)).[8] Failing to check parental sign-out sheets is not a violation of the *1107 Minimum Standards, and McDaniels admitted that fact.
In reference to this issue, the main opinion states that "an agency's interpretation of its rules and regulations is entitled to deference, and it must stand if it can be said to be reasonable." 874 So.2d at 1097. What constitutes the "agency's interpretation" of Rule 660-5-25-.05(4)(g) regarding sign-out sheetsâ McDaniel's testimony, or DHR's argument on appeal? The two are inconsistent. I think the conflict between McDaniel's testimony and DHR's argument on appeal makes it clear that DHR had no official policy with regard to sign-out sheets prior to this litigation. Deference to agency interpretation is due "when the agency `has made a written interpretation of the regulation or has maintained a longstanding policy on the subject.'" Bradberry v. Director, Office of Workers' Comp. Programs, 117 F.3d 1361, 1366 (11th Cir.1997) (quoting McKee v. Sullivan, 903 F.2d 1436, 1438 n. 3 (11th Cir. 1990)). However, a reviewing court owes no deference to an agency's interpretation of its own regulation "when an agency has not formulated an official interpretation of its regulation, but is merely advancing a litigation position." United States v. Trident Seafoods Corp., 60 F.3d 556, 559 (9th Cir.1995).
Moreover, even if, despite the lack of an official DHR policy regarding sign-out sheets, the deference-to-agency-interpretation rule were pertinent, it would not be applicable here for another reason. The "plain-meaning" rules of statutory construction apply to the interpretation of administrative regulations. See State Personnel Bd. v. Wallace, 682 So.2d 1357 (Ala. Civ.App.1996). Accord Akins v. United States, 194 Ct.Cl. 477, 439 F.2d 175, 179 (1971). It is well established that a reviewing court's deference to an agency's construction of its own regulation is due "only when the plain meaning of the [regulation] itself is doubtful or ambiguous.... Deference to agency interpretations is not in order if the [regulation's] meaning is clear on its face." Pfizer, Inc. v. Heckler, 735 F.2d 1502, 1509 (D.C.Cir.1984). The meaning of the sign-out regulation at issue in this case is clear: the center is required to have parents sign out their children, not to have employees check the sign-out sheets.
"The `plain meaning' rule of construction is ... not a linguistic straightjacket, but rather a safeguard against exotic interpretations which have the effect of depriving those regulated of a fair opportunity to conform their conduct to the law." Getty Oil Co. v. Department of Energy, 569 F.Supp. 1204, 1209 (D.Del.1983). The main opinion's construction of the DHR regulation relating to sign-out sheets is, to say the least, an "exotic" interpretation. The interpretation is alarming because it indicates the court's willingness to validate an after-the-fact rationale for agency action that would deny a regulated entity the "opportunity to conform [its] conduct to the law." See id.
Considering the findings and conclusions of the hearing officer that are supported by substantial evidence and relevant legal authority, the following grounds for revoking KK's nighttime child-care license remain:
1. In March 1998, KK employees left a sleeping child unattended for approximately one hour in KK's closed and locked center.
2. In January 1998, KK hired an underage child-care worker whose being assigned to supervise children resulted in a violation of child/staff-ratio regulations.
3. In August 1992, KK failed to properly supervise sleeping toddlers.
*1108 As I have previously discussed, DHR presented no evidence to support its revocation action under either subsection (2) (allowing revocation if the licensee violates the "provisions of the license issued") or (3) (allowing revocation if the licensee furnishes or makes any misleading or false statements or report to DHR) of § 38-7-8. If the revocation action is to be upheld, it must be under subsection (1) of § 38-7-8 (allowing revocation if the licensee "[c]onsistently fail[s] to maintain standards prescribed and published by [DHR]"). I do not think that the three legally and factually valid bases for seeking revocation mentioned above constitute a "consistent failure" by KK to maintain standards prescribed by DHR.
The Minimum Standards do not define "consistent failure." The two DHR witnesses who testified at the administrative hearing provided different interpretations of the phrase. McDaniel testified that one violation of the Minimum Standards that involves a lack of supervision of children can constitute a "consistent failure." Her supervisor, Debbie Thomas, stated that, if every time a DHR representative visits a child-care facility, the representative finds a violation of the Minimum Standards, then the licensee has "consistently failed" to maintain standards. Merriam-Webster's Collegiate Dictionary includes, among its definitions for the word "consistent," the following:
"marked by harmony, regularity, or steady continuity: free from variation or contradiction ...: showing steady conformity to character, profession, belief, or custom."
Id. at 246 (10th ed.2002).
In the present case, the evidence established that DHR issued KK's first nighttime-care license in 1992. DHR representatives visited KK's facility only twice in seven years, once in 1992 and once in 1998. In the intervening years, DHR neither visited nor inspected the facility and did not note any complaints regarding the facility. Section 38-7-5(a), Ala.Code 1975, provides that a child-care license is valid for two years from the issue date. Section 38-7-4, Ala.Code 1975, provides that DHR shall issue a renewal license if it is "satisfied that the facility and the responsible persons reasonably meet standards prescribed." Therefore, when DHR issued KK a renewal licenses in 1994, it must have been satisfied that KK had reasonably complied with the Minimum Standards.
A "consistent failure" implies a course of conduct that is regular and chronic, not occasional and sporadic. Cf. Wadena Implement Co. v. Deere & Co., 480 N.W.2d 383, 388 (Minn.Ct.App.1992)(holding that a manufacturer did not have good cause for terminating its business relationship with an agricultural equipment dealer under a statutory standard allowing for termination if the dealer "`consistently fails to meet the manufacturer's market penetration requirements'" because the dealer's failure to meet the requirements "must occur over a number of intervals before the `consistently fails' standard for termination can be met").
If a student failed math during one reporting period in his sixth-grade year, then made acceptable grades during his seventh-, eighth-, ninth-, tenth-, and eleventh-grade years, but failed math again during two reporting periods in his senior year, his parents would hardly be justified in complaining that he had "consistently failed" math. I fail to see how any reasonable interpretation of the phrase "consistently fails," in the context of complying with regulatory standards, could encompass three instances of noncompliance, the first instance separated from the second and third instances by six (compliant) *1109 years. Only a consistent failure to comply with the Minimum Standardsâ not a one-time, albeit potentially dangerous, failure to comply with the Minimum Standardsâ authorizes license revocation under § 38-7-8(1). "`[A]dministrative action cannot subvert or enlarge upon the statutory policy.... Administrative implementation cannot deviate from the principle and policy of the statute.'" McCrory v. Wood, 277 Ala. 426, 431, 171 So.2d 241, 247 (1965) (quoting Abelson's, Inc. v. New Jersey State Bd. of Optometrists, 5 N.J. 412, 424, 75 A.2d 867, 873 (1950)).
KK has strenuously argued to this court that there is no definition of the phrase "consistent failure" in DHR's regulations; that DHR's own witnesses differed as to the meaning of the phrase; and, citing Wadena Implement Co. v. Deere & Co., supra, that its own shortcomings do not amount to the "consistent failure" required by § 38-7-8(1). This dissent is not "creating an argument for KK" by advancing an interpretation of the statutory phrase "[c]onsistently fail to maintain standards." It is taking the argument that KK does make to its logical conclusion.
Tiptoeing around traditional principles of regulatory interpretation, the main opinion wrongly bases its finding that KK "consistently failed" to comply with the Minimum Standards on the inexcusable incident that took place on March 26-27, 1998. However, as the Alabama Supreme Court observed almost a century ago in the criminal context,
"It matters not that the prisoner may have been guilty of the most revolting crime known to our laws.... It is vain for us to write in our Constitution [a provision for due process of law,] if our government cannot or will not enforce it. A law not enforced is no law at all." State ex rel. Attorney General v. Jinwright, 172 Ala. 340, 343-44, 55 So. 541, 42 (1911).
The evidence in this case supports a determination that KK sporadically failed to comply with the Minimum Standards, but not a determination that it "consistently failed" to do so. I would therefore hold that the decision to revoke KK's license was "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." See § 41-22-20(k)(6).
MURDOCK, J., concurs.
NOTES
[1] Some of the events surrounding the incident in which the child was left unattended and locked alone in the KK facility occurred in the early hours of the morning of March 27, 1998. However, because the events leading to the incident began on March 26, 1998, for the purposes of this opinion, we refer to the incident as the "March 26, 1998, incident."
[2] The record indicates that the delay in Hines's arrival might have been attributable to a miscommunication with the police about where Hines should wait for news of the child.
[3] Effective January 22, 2001, Rule 660-5-25-.05 was repealed; it was replaced with Rule 660-5-26.
[4] Section 38-7-7(a), Ala.Code 1975, of the Child Care Act of 1971, requires DHR to "prescribe and publish minimum standards for licensing and for approving all child-care facilities."
[5] KK does not contend in its brief to this court that DHR failed to cite in the April 2, 1998, charge letter appropriate supporting authority for its decision to seek to revoke KK's nighttime-care license.
[6] Bolden's birth date is June 3, 1979; she turned 19 a few months after the March 26, 1998, incident.
[7] The record indicates that DHR instituted a "Child Abuse and Neglect" proceeding against Donna Kelley, the owner of KK. Also, Mitchell Kelly, as president of "Kids' Klub II," appealed DHR's denial of Kids' Klub II's application for a night-time care license. Those proceedings were pending at the same or approximately the same time as this case.
[8] The hearing officer found that the charges in sections D(2) and C(3) of the charge letter were not substantiated by the evidence.